CLOVERLEAF BUTTER CO. *v.* PATTERSON, COM-
MISSIONER OF AGRICULTURE AND INDUS-
TRIES OF ALABAMA, ET AL.

No. 28.   Argued December 9, 10, 1941.—Decided February 2, 1942.

*Messrs. Erle Pettus* and *Horace C. Wilkinson* for pe-
titioner.

*Messrs. Charles L. Rowe* and *William H. Loeb,* Assistant Attorney General of Alabama, argued the cause, and *Mr. Thomas S. Lawson,* Attorney General, and *Mr. Loeb* were on the brief, for respondents.

MR. JUSTICE REED delivered the opinion of the Court.

The petitioner, Cloverleaf Butter Company, is engaged at Birmingham, Alabama, in the manufacture of process or renovated butter from packing stock butter. It obtains 25% of its supplies of packing stock butter from the farmers and country merchants of Alabama and 75% from those of other states, and it ships interstate 90% of its finished product. The production of renovated butter is taxed and regulated by the United States. Internal Revenue Code, c. 16, §§ 2320 to 2327 inc. It is also regulated by Alabama. Ala. Code 1940, Tit. 2, c. 1.

The respondents, Alabama officials charged with the duty of enforcing the Alabama laws in regard to renovated

butter, entered petitioner's factory and, in a little more than a year, seized on sixteen separate occasions a total of over twenty thousand pounds of packing stock butter, the material from which the finished product is made. Defendants also seized some butter moving to the factory in interstate commerce. There is no allegation that condemnation proceedings have been completed.

Alleging repeated seizures and danger of their continuance, to the demoralization and financial impairment of its business, petitioner brought an action, Judicial Code § 24 (1), in the District Court to enjoin the defendants from acting under the Alabama statute, either to determine the wholesomeness of renovated butter made from the raw material in petitioner's hands, to inspect its raw material and plant, or to seize and to detain petitioner's packing stock butter. The theory of the bill is that the federal legislation and regulations concerning the manufacture of process or renovated butter exclude such state action. Cf. *Hebe Co.* v. *Shaw*, 248 U. S. 297; *Corn Products Rfg. Co.* v. *Eddy*, 249 U. S. 427. There was a motion to dismiss on the ground that the complaint did not state a cause of action. A stipulation entitled as one of "facts" was entered into. The District Court dismissed the bill, the Circuit Court of Appeals affirmed, 116 F. 2d 227, and we granted certiorari because of the important question of federal law involved in petitioner's contention that these federal statutes providing for regulation of production of a commodity excluded state action. 313 U. S. 551.

The so-called stipulation of facts just mentioned is really a limitation of issues. One paragraph of the stipulation will crystallize the essential elements of the dispute. It reads: "The parties to this cause stipulate and agree that the legal questions in dispute between the parties are: . . . 2. Does the inspection of packing stock butter, in interstate commerce, used by the plaintiff in the manufac-

ture of process or renovated butter as alleged in the bill of complaint, made or directed to be made by the Secretary of Agriculture of the United States, pursuant to the Federal laws and regulations relating to renovated or process butter, have the effect in connection with said Federal laws of excluding the State of Alabama, its officers and agents, from inspecting or seizing or suspending the packing stock butter, in interstate commerce out of which renovated butter to be sold in interstate commerce as alleged in the complaint is manufactured by the plaintiff as alleged in the complaint?" As other paragraphs state variations of this controversy, or conclusions of law not controlling on the courts, *Estate of Sanford* v. *Commissioner*, 308 U. S. 39, 51, we need not consider them further. The central question presented in the petition for certiorari accords with the excerpt from the stipulation.

Apparently there is no specific allegation or admission that the packing stock butter which Alabama inspected and seized was the property of the petitioning manufacturer at the time. It has, however, been so treated by the courts and parties, and properly so, we conclude, from the allegations of the bill.[1] The reach of this decision is therefore limited to Alabama's inspection and seizure of packing stock butter, actually owned by petitioner and held in its own hands or those of its bailees, whether in factory,

---

[1] Petitioner, paragraph 19 of its bill of complaint, avers that packing stock butter is delivered to it for processing which is produced in Alabama and other states; that the Alabama officials, paragraph 20, claim the right to enter the premises where it receives the butter acquired by it in interstate commerce and to "seize, suspend or otherwise deprive plaintiff of the right to use such raw material or packing stock butter, and to stop and search trucks moving in interstate commerce hauling said raw material from places without the State of Alabama to plaintiff's place of business in Birmingham, Alabama, and to seize, suspend or otherwise deprive plaintiff the right to use the said raw material or packing stock butter being so transported in interstate commerce and to [stop and search] trucks transporting the aforesaid raw material

warehouse, or course of carriage, for manufacture into process or renovated butter for interstate or foreign commerce.

The test to be applied to the action of the state in seizing material intended solely for incorporation into a product prepared for interstate commerce is the effect of that action upon the national regulatory policy declared by the federal statute. Cf. *Illinois Natural Gas Co.* v. *Central Illinois Public Service Co.*, 314 U. S. 498, 505. Not only

---

from points in Alabama to plaintiff's plant in Birmingham, Alabama, to be used in the manufacture of process or renovated butter as aforesaid."

Petitioner further avers, as to seizures at its plant, "Between, to-wit, the 17th day of April, 1939, and the 22nd day of June, 1940, defendants on 16 separate occasions, seized in Birmingham, Alabama, a total of 20924 pounds of plaintiff's raw material or packing stock butter which originated in whole or in part, in states of the United States outside of the State of Alabama and which had been so delivered to the plaintiff's plant in Birmingham, Alabama, as raw material and which was not being sold, offered or exposed for sale, or attempted for sale in its then condition but was being held by the plaintiff solely and exclusively for the purpose of using the same as raw material out of which to manufacture process or renovated butter in the usual course of plaintiff's business. . . . Plaintiff avers on, to-wit, the 21st day of June, 1940, in making the last seizure, above referred to, the defendants stopped a truck moving in interstate commerce from the State of Georgia to the State of Alabama transporting said raw material known as packing stock butter from the State of Georgia to the plaintiff in Birmingham, Alabama. Plaintiff avers that as a result of the seizure of said raw materials by defendants, it has been denied the use thereof; the seizure and detention of said raw material has caused great financial loss to the plaintiff in that plaintiff is required to pay the storage on the same and is denied the use of such raw materials that plaintiff sorely needs in the conduct of its business, and has caused plaintiff's plant to remain idle from time to time for the lack of sufficient raw material to keep the same operating; that said action of the defendants demoralizes plaintiff's employees who are employed, to operate said plant, and is calculated to and does interfere with the sale of its finished product in interstate commerce."

does Congressional power over interstate commerce extend, the "Laws of any State to the Contrary notwithstanding,"[2] to interstate transactions and transportation, but it reaches back to the steps prior to transportation and has force to regulate production "with the purpose of so transporting" the product. *United States v. Darby,* 312 U. S. 100, 117. It extends to the intrastate activities which so affect commerce as to make regulation of them appropriate means to the attainment of a legitimate end, regulation of interstate commerce. *Id.,* 118 *et seq.,* and cases cited. By the regulatory provisions of I. R. C. § 2325, note 10, *infra,* the entire process of manufacture is subject to federal supervision. Thus, so far as any situation here involved is concerned, the scope of Congressional power is such that it may override the exercise of state power and render impossible its application to petitioner's manufacturing processes.

This power of Congress to exercise exclusive control over operations in interstate commerce is not in dispute here.[3] Nor is this power limited to situations where national uniformity is so essential that, lacking Congres-

---

[2] Constitution, Article VI.

[3] Cases which sustain state enactments as permissible, where federal legislation generally applicable to the field exists, recognize that federal action might forbid or exclude the state statutes approved in those instances. *Savage* v. *Jones,* 225 U. S. 501, 529: "The question remains whether the statute of Indiana is in conflict with the act of Congress known as the Food and Drugs Act of June 30, 1906 (34 Stat. 768, c. 3915). For the former, so far as it affects interstate commerce even indirectly and incidentally, can have no validity if repugnant to the Federal regulation." *Corn Products Rfg. Co.* v. *Eddy,* 249 U. S. 427; *Mintz* v. *Baldwin,* 289 U. S. 346, 351; *Pacific States Co.* v. *White,* 296 U. S. 176, 183; *Hartford Indemnity Co.* v. *Illinois,* 298 U. S. 155, 158; *Welch Co.* v. *New Hampshire,* 306 U. S. 79, 85; *Eichholz* v. *Comm'n,* 306 U. S. 268, 274; *Duckworth* v. *Arkansas,* 314 U. S. 390.

sional permission, all state action is inadmissible notwithstanding a complete absence of federal legislation.[4] Exclusive federal regulation may arise, also, from the exercise of the power of Congress over interstate commerce where, in the absence of Congressional action, the states may themselves legislate. It has long been recognized that, in those fields of commerce where national uniformity is not essential, either the state or federal government may act. *Willson* v. *Black-bird Creek Marsh Co.,* 2 Pet. 245; *California* v. *Thompson,* 313 U. S. 109, 114. Where this power to legislate exists, it often happens that there is only a partial exercise of that power by the federal government. In such cases the state may legislate freely upon those phases of the commerce which are left unregulated by the nation.[5] But

[4] *Cooley* v. *Board of Wardens,* 12 How. 299, 319; *Bowman* v. *Chicago & Northwestern Ry. Co.,* 125 U. S. 465, 485; *Leisy* v. *Hardin,* 135 U. S. 100, 119; *Minnesota Rate Cases,* 230 U. S. 352, 399. Where the federal legislation authorizes state action, such state action is permissible even as to matters which could otherwise be regulated only by uniform national enactments. *In re Rahrer,* 140 U. S. 545, 561; *Clark Distilling Co.* v. *Western Maryland Ry. Co.,* 242 U. S. 311, 325, *et seq.; Whitfield* v. *Ohio,* 297 U. S. 431; *Kentucky Whip & Collar Co.* v. *Illinois Central R. Co.,* 299 U. S. 334, 350.

[5] *Merchants Exchange* v. *Missouri,* 248 U. S. 365, 368 (United States Warehouse Act permits state laws for inspection and weighing by specific direction of § 29, 39 Stat. 490; cf. Act of March 2, 1931, c. 366, 46 Stat. 1465); *Whipple* v. *Martinson,* 256 U. S. 41 (state regulates prescriptions of narcotics further than United States); *Northwestern Bell Tel. Co.* v. *Nebraska Comm'n,* 297 U. S. 471, 479 (telephone depreciation); *Hartford Indemnity Co.* v. *Illinois,* 298 U. S. 155, 159 (specific authority for state laws to continue in operation); *Kelly* v. *Washington,* 302 U. S. 1, 9 (state inspection of hulls omitted from federal inspection); *South Carolina Hwy. Dept.* v. *Barnwell Bros.,* 303 U. S. 177, note 5 (state regulation of truck weight and width omitted from federal regulation by the federal Motor Carrier Act of 1935, 49 Stat. 546); *Welch Co.* v. *New Hamp-*

where the United States exercises its power of legislation so as to conflict with a regulation of the state, either specifically [6] or by implication,[7] the state legislation becomes inoperative and the federal legislation exclusive in its application.

When the prohibition of state action is not specific but inferable from the scope and purpose of the federal legislation, it must be clear that the federal provisions are inconsistent with those of the state to justify the thwarting of state regulation.[8]

Apparently there are no cases of this Court dealing specifically with state interference with federally regulated manufacturing. It is evident, we think, that the same principles govern state action in this field as in the instances cited under note 7 to show the exclusive power of federal enactments in transportation, employers liabil-

_shire,_ 306 U. S. 79 (maximum hours of employees regulated by state prior to effective date of federal regulation); _Eichholz_ v. _Comm'n,_ 306 U. S. 268, 274 (intrastate transportation regulations infringed); _Maurer_ v. _Hamilton,_ 309 U. S. 598, 606 (state regulation of size and weight reserved from federal regulation). Frequently this Court has recognized the power of the state in such circumstances over other interstate carriers. _Minnesota Rate Cases,_ 230 U. S. 352, 408, and cases cited; _Erie R. Co._ v. _Williams,_ 233 U. S. 685; _Erie R. Co._ v. _Public Utility Comm'rs,_ 254 U. S. 394, 409; _Missouri Pacific R. Co._ v. _Norwood,_ 283 U. S. 249.

[6] Cf. 7 U. S. C. § 269 (1940); 29 U. S. C. § 160 (a) (1940).

[7] _Texas & Pacific Ry. Co._ v. _Abilene Cotton Oil Co.,_ 204 U. S. 426, 437; _Adams Express Co._ v. _Croninger,_ 226 U. S. 491, 505; _New York Central R. Co._ v. _Winfield,_ 244 U. S. 147, 150; _Oregon-Washington R. Co._ v. _Washington,_ 270 U. S. 87, 101 (cf. amendment to meet decision, 44 Stat. 250); _Napier_ v. _Atlantic Coast Line,_ 272 U. S. 605, 612; _Missouri Pacific R. Co._ v. _Porter,_ 273 U. S. 341, 345; _Hines_ v. _Davidowitz,_ 312 U. S. 52, 66; _Illinois Natural Gas Co._ v. _Central Ill. Pub. Serv. Co.,_ 314 U. S. 498, 509.

[8] _Texas & Pacific Ry. Co._ v. _Abilene Cotton Oil Co., supra; Savage_ v. _Jones,_ 225 U. S. 501, 533; _Corn Products Rfg. Co._ v. _Eddy,_ 249 U. S. 427, 435; _Whipple_ v. _Martinson,_ 256 U. S. 41, 45; _Mintz_ v. _Baldwin,_ 289 U. S. 346, 350; _Kelly_ v. _Washington,_ 302 U. S. 1, 10.

ity, quarantine and aliens. The rule is clear that state action may be excluded by clear implication or inconsistency. Its application to individual cases creates difficulties. The differentiation between cases where the assumption of federal power is exclusive and where it admits state action is narrow. For example, in *Oregon-Washington R. Co.* v. *Washington,* 270 U. S. 87, Section 8 of the Plant Quarantine Act, 37 Stat. 315, as amended 39 Stat. 1165, 7 U. S. C. § 161, was held to exclude a state quarantine against plant infestation. Yet, a little later, in *Mintz* v. *Baldwin,* 289 U. S. 346, a very similar statute, the Cattle Contagious Diseases Act, was held to permit a state quarantine, because this latter act differed from the former, in that its provisions, page 352, "by specification of the cases in which action under it shall be exclusive, disclose the intention of Congress that, subject to the limitations defined, state measures may be enforced. This difference is essential and controlling." Cf. 21 U. S. C. § 126.

It is urged that the later *Welch, Eichholz* and *Maurer* cases, cited above, which allow state action when the federal statute does not cover the particular point regulated, show a trend away from the doctrine of the *Oregon-Washington Co.* decision. Other similar instances may be found in notes 3 and 5, *supra.* In all of these, however, it was the ruling of this Court that the federal enactment was consistent with the narrow regulation sought to be enforced by the state, so that the state enactment did not stand "as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Hines* v. *Davidowitz,* 312 U. S. 52, 67. As the principle upon which the cases referred to in this paragraph are decided is clear, a single comparison will sufficiently illustrate the reasons which lead to a denial of state power. *Savage* v. *Jones,* 225 U. S. 501, construed an Indiana statute requiring disclosure of formulas on foods offered

for sale in Indiana while in interstate commerce. The Pure Food and Drugs Act, 34 Stat. 768, prohibited, so far as here pertinent, interstate shipments if misbranded by bearing "any statement, design, or device . . . false or misleading." This Court said, p. 532:

"Congress has thus limited the scope of its prohibitions. It has not included that at which the Indiana statute aims. Can it be said that Congress, nevertheless, has denied to the State, with respect to the feeding stuffs coming from another State and sold in the original packages, the power the State otherwise would have to prevent imposition upon the public by making a reasonable and nondiscriminatory provision for the disclosure of ingredients, and for inspection and analysis?"

The Indiana Act was upheld. On the other hand, *McDermott* v. *Wisconsin*, 228 U. S. 115, makes plain the basis for prohibiting interferences with federal power. In this latter case a Wisconsin law required glucose mixtures offered for retail sale to be labeled "Glucose flavored with" the flavoring material. Any other "designation or brand" on the package was prohibited. A glucose mixture was offered labeled "Karo Corn Syrup" "10% Cane Syrup, 90% Corn Syrup." Pointing out that federal authority, for the sake of efficiency in protecting the public against misbranding in interstate trade, extended far enough to regulate labeling on packages while being offered to consumers, and that the Pure Food and Drugs Act tolerated the more euphemistic label prohibited by the state, this Court said, p. 133:

"Conceding to the State the authority to make regulations consistent with the Federal law for the further protection of its citizens against impure and misbranded food and drugs, we think to permit such regulation as is embodied in this statute is to permit a State to discredit and burden legitimate Federal regulations of interstate commerce, to destroy rights arising out of the Federal statute

which have accrued both to the Government and the shipper, and to impair the effect of a Federal law which has been enacted under the Constitutional power of Congress over the subject."

In the *Savage* case, there was no conflict, inconsistency or interference; in the *McDermott* case, there was. *McDermott* pointed out the distinction, and the inapplicability of the *Savage* rule to the Wisconsin situation. 228 U. S. 115, 131–32.

Turning to the statutes in question, we find that the greater part of the legislation relating to process or renovated butter is in § 2320 to § 2327 of the Internal Revenue Code.[9] These sections define process or renovated butter, fix the rate of poundage tax upon it, as well as the amount of special tax upon its manufacturers, and provide for their collection. They require manufacturers to file such notices and inventories, keep such books, render such returns, post such signs, affix such number to his factory, and furnish such bond as the Treasury Department may require. Wholesale dealers are required to keep books and render returns to the same department. Penalties are provided. Specific provisions are made for inspection of the places of manufacture or storage of the materials and the renovated butter itself. Power is given to confiscate the finished product. Sanitary provisions applicable for slaughtering, meat canning or similar establishments are extended to cover process and renovated butter factories. The sections necessary for the discussion are set out in the note below.[10] The references to animal and meat in-

[9] These sections are derived from the Acts of August 2, 1886, c. 840, 24 Stat. 209; May 9, 1902, c. 784, 32 Stat. 193; August 10, 1912, c. 284, 37 Stat. 273.

[10] § 2325. Inspection, manufacture, storage, and marking of process or renovated butter. "The Secretary of Agriculture is authorized and required to cause a rigid sanitary inspection to be made, at such times as he may deem proper or necessary, of all factories and store-

160

spection statutes in § 2327 (b) made applicable to the butter in question the power of the Secretary of Agriculture to inspect and certify as wholesome for human food salt pork and bacon intended for exportation, and the requirement that inspected carcasses of cattle, sheep and swine found unwholesome shall not be subjects of interstate transportation.

There are two provisions of law applicable to process and renovated butter production which may be conveniently considered and disposed of at this point.

houses where process or renovated butter is manufactured, packed, or prepared for market, and of the products thereof and materials going into the manufacture of the same. All process or renovated butter and the packages containing the same shall be marked with the words 'Renovated Butter' or 'Process Butter' and by such other marks, labels, or brands and in such manner as may be prescribed by the Secretary of Agriculture, and no process or renovated butter shall be shipped or transported from its place of manufacture into any other State or Territory or the District of Columbia, or to any foreign country, until it has been marked as provided in this section. The Secretary of Agriculture shall make all needful regulations for carrying this section and sections 2326 (c) and 2327 (b) into effect and shall cause to be ascertained and reported from time to time the quantity and quality of process or renovated butter manufactured, and the character and the condition of the material from which it is made. And he shall also have power to ascertain whether or not materials used in the manufacture of said process or renovated butter are deleterious to health or unwholesome in the finished product, and in case such deleterious or unwholesome materials are found to be used in product intended for exportation or shipment into other States or in course of exportation or shipment he shall have power to confiscate the same."

§ 2326 (c). Failure to comply with provisions relating to the manufacture, storage, and marking of process or renovated butter. "Any person, firm, or corporation violating any of the provisions of section 2325 shall be deemed guilty of a misdemeanor and on conviction thereof shall be punished by a fine of not less than $50 nor more than $500 or by imprisonment not less than one month nor more than six months, or by both said punishments, in the discretion of the court."

§ 2327 (b). Inspection of live cattle and meat. "All parts of an act providing for an inspection of meats for exportation, approved August

(a) By § 1 of the Act of May 9, 1902, it is provided that importations of process and renovated butter shall be subject to the laws of the state as though produced therein.[11] This is obviously an adaptation of the Wilson or Original Packages Act to the problem of butter substitutes, passed to overcome the force of some of the cases forbidding state prohibition of sales of these substitutes.[12] It is clearly inapplicable to the case now under consideration, but indicates a Congressional purpose not to hinder the free exercise of state power, except as it may be inconsistent with the federal legislation. The argument that

30, 1890, c. 839, 26 Stat. 414, and of an Act to provide for the inspection of live cattle, hogs, and the carcasses and products thereof which are the subjects of interstate commerce, approved March 3, 1891, c. 555, 26 Stat. 1089, and of amendment thereto approved March 2, 1895, c. 169, § 1, 28 Stat. 732, which are applicable to the subjects and purposes described in section 2325 shall apply to process or renovated butter."

§ 2327 (c). Slaughtering and meat canning. "The sanitary provisions for slaughtering, meat canning, or similar establishments as set forth in the act of June 30, 1906, c. 3913, 34 Stat. 676, shall be extended to cover renovated butter factories as defined in this subchapter, under such regulations as the Secretary of Agriculture may prescribe."

[11] 32 Stat. 193, 21 U. S. C. § 25. "All articles known as oleomargarine, butterine, imitation, process, renovated, or adulterated butter, or imitation cheese, or any substance in the semblance of butter or cheese not the usual product of the dairy and not made exclusively of pure and unadulterated milk or cream, transported into any State or Territory or the District of Columbia, and remaining therein for use, consumption, sale, or storage therein, shall, upon the arrival within the limits of such State or Territory or the District of Columbia, be subject to the operation and effect of the laws of such State or Territory or the District of Columbia, enacted in the exercise of its police powers to the same extent and in the same manner as though such articles or substances had been produced in such State or Territory or the District of Columbia, and shall not be exempt therefrom by reason of being introduced therein in original packages or otherwise."

[12] Cf. 26 Stat. 313; *In re Rahrer*, 140 U. S. 545; *Schollenberger* v. *Pennsylvania*, 171 U. S. 1; *Collins* v. *New Hampshire*, 171 U. S. 30; *State* v. *Collins*, 70 N. H. 218, 45 A. 1080, aff. by an equally divided court, 187 U. S. 636; *Plumley* v. *Massachusetts*, 155 U. S. 461.

it is improper to infer a restriction on confiscation of material when confiscation of product is permitted fails to give weight to the difference between a confiscation which interferes with production under federal supervision and confiscation after production because of a higher standard demanded by a state for its consumers. The latter type is permissible under all the authorities.

(b) By § 4 of the same Act, R. S. § 3243 was made "to extend to and include and apply to" manufacture of processed and renovated butter. That section, now I. R. C. § 3276, provides that the payment of the tax laid by the act under consideration "shall not be held to exempt any person from any" state penalty "or in any manner to authorize the commencement or continuance of such trade or business contrary to the laws of such State." It is urged by respondent that this section makes it "clear that the power of the States over the subject of the manufacture and sale of process and renovated butter within their respective limits was to be unrestricted, even though the effect of such regulation might be the imposition of an indirect burden upon interstate commerce." This section without doubt manifests the will of Congress that federal taxation shall not, of itself, incapacitate the state. *Austin v. Tennessee,* 179 U. S. 343; *Plumley v. Massachusetts,* 155 U. S. 461, 466. In our view, however, the section goes no farther than to make certain that federal taxation shall not paralyze state action. Other regulations may or may not supersede state laws. Cf. *Merchants Exchange v. Missouri,* 248 U. S. 365, 368; *Hartford Indemnity Co. v. Illinois,* 298 U. S. 155, 159.

There are also two other elements of the federal legislation which may be considered from the negative viewpoint. This is not solely a revenue act. Respondent strongly urges that it must be treated as primarily for the purpose of increasing federal income, and that therefore there should be no judicial deduction that the incidental

regulatory features are exclusive. For this there is support in the precedents. *McCray* v. *United States,* 195 U. S. 27.[13] While there has long been recognition of the authority of Congress to obtain incidental social, health or economic advantages from the exercise of constitutional powers,[14] it has been said that such collateral results must be obtained from statutory provisions reasonably adapted to the constitutional objects of the legislation. *Linder* v. *United States,* 268 U. S. 5, 17. But here the respondent's contention is inapplicable because the regulatory provisions in controversy are authorized by the Commerce Clause. *Pittsburgh Melting Co.* v. *Totten,* 248 U. S. 1, 8; *Sunshine Anthracite Coal Co.* v. *Adkins,* 310 U. S. 381; *United States* v. *Darby, supra,* 119.

Further, we agree with respondent's contention that there is no authority to confiscate or destroy materials under the renovated butter act. It should be noted that packing stock adulterated under the definitions of § 402 of the Federal Food, Drug, and Cosmetic Act, 52 Stat. 1046, when introduced into or while in interstate commerce may be confiscated under § 304 while in interstate commerce or at any time thereafter. Cf. *United States* v. *Nine Barrels of Butter,* 241 F. 499. Petitioner argues that the provisions for meat inspection, made applicable to process and renovated butter factories by I. R. C. § 2327, note 10, *supra,* include Title 21, § 72 of the United States Code. Section 72 does authorize the destruction of unfit carcasses of cattle, hogs and sheep intended for human consumption, and we assume, if applicable, would authorize a similar destruction of the materials intended for butter

---

[13] Cf. *In re Kollock,* 165 U. S. 526; *Plumley* v. *Massachusetts,* 155 U. S. 461, 466. These were based on the earlier act of 1886, 24 Stat. 209, which did not carry the inspection and condemnation provisions now applicable to process and renovated butter.

[14] *Veazie Bank* v. *Fenno,* 8 Wall. 533; *McCray* v. *United States,* 195 U. S. 27, 55; *United States* v. *Darby,* 312 U. S. 100, 115.

manufacture. Section 72, however, is derived from 34 Statutes at Large 674. The provisions which I. R. C. § 2327 makes applicable are the sanitary provisions as set forth in the Act of June 30, 1906, c. 3913, 34 Stat. 676.[15] These relate only to inspection and not to condemnation or destruction.[16] Nor do we find such power in the regulatory provisions of § 2325, note 10, *supra,* or any interpretation by the Department of Agriculture leading to that conclusion. The regulations contain no directions for condemnation. B. D. I. Order No. 1—Revised, December 24, 1936; 9 C. F. R. 301. The views of the Solicitors of Agriculture have long been in accord with our conclusion. Opinion No. 2829, October 18, 1940.[17]

[15] "The Secretary of Agriculture shall cause to be made, by experts in sanitation or by other competent inspectors, such inspection of all slaughtering, meat canning, salting, packing, rendering, or similar establishments in which cattle, sheep, swine, and goats are slaughtered and the meat and meat food products thereof are prepared for interstate or foreign commerce as may be necessary to inform himself concerning the sanitary conditions of the same, and to prescribe the rules and regulations of sanitation under which such establishments shall be maintained; and where the sanitary conditions of any such establishment are such that the meat or meat food products are rendered unclean, unsound, unhealthful, unwholesome, or otherwise unfit for human food, he shall refuse to allow said meat or meat food products to be labeled, marked, stamped, or tagged as 'inspected and passed.' "

[16] An error appeared in 26 U. S. C. § 997 (c) in the codification of the proviso of 37 Stat. 273, which extended the sanitary provisions of the Act of June 30, 1906, 34 Stat. 676, to renovated butter, so that the codification read: "The sanitary provisions for slaughtering, meat canning, or similar establishments as set forth in sections 71 to 93 of Title 21, shall be extended to cover renovated butter factories as defined in this subchapter, under such regulations as the Secretary of Agriculture may prescribe." This error was corrected in I. R. C. § 2327 (c). See note 10, *supra.*

[17] Legislative history indicates that a contrary purpose was in the mind of the departmental proponents of the 1912 legislation. See 48 Cong. Rec. 2690–91, 6325; House Rep. No. 271, 62d Cong., 2d Sess., p. 4; Sen. Rep. No. 696, 62d Cong., 2d Sess., p. 2; Conference Report,

The state act, which petitioners say conflicts and interferes with the federal, is the usual type of general food and drug regulation. Alabama Code 1940, Tit. 2, c. 1. Power is conferred on the state Board of Agriculture and Industries to promulgate rules and regulations with the Commissioner of Agriculture and Industries as the chief administrative official. The issue arises over action taken under § 495, quoted so far as pertinent below.[18]

The controversy comes to this: The federal law requires, § 2325, note 10, *supra*, "a rigid sanitary inspection . . . of all factories and storehouses where process or renovated butter is manufactured, packed, or prepared for market, and of the products thereof and materials going into the manufacture of the same," i. e., packing stock butter.[19]

---

House Rep. No. 1150, 62d Cong., 2d Sess., pp. 1, 10; Hearings on the Estimates of Appropriations (Agricultural Appropriation Bill), House Committee on Agriculture, 62d Cong., 2d Sess., pp. 325–328; Hearing on Agriculture Appropriation Bill, Senate Subcommittee of Committee on Agriculture and Forestry, 62d Cong., 2d Sess., pp. 14–15.

[18] "Any article, substance, material, or product, the possession and sale of which is regulated under the provisions of this chapter, which is adulterated, misbranded . . . within the meaning of any provision of this chapter, and which is manufactured for sale, held in possession with intent to sell, offered or exposed for sale, or sold or delivered within this state, shall be liable to be proceeded against in the circuit court of the county where the same is found, and seized for confiscation by writ of attachment for condemnation. Such writ shall issue upon the sworn complaint of the commissioner or his duly authorized agent, . . . If a judgment of condemnation and confiscation is rendered against such article or product as being adulterated . . . the same shall be disposed of by destruction or sale, as the court may direct . . ."

[19] 26 U. S. C. § 2325. "And he shall also have power to ascertain whether or not materials used in the manufacture of said process or renovated butter are deleterious to health or unwholesome in the finished product, and in case such deleterious or unwholesome materials are found to be used in product intended for exportation or shipment into other States or in course of exportation or shipment he shall have power to confiscate the same."

But, as we have seen, the Secretary of Agriculture of the United States cannot condemn the packing stock butter. The Commissioner of Agriculture and Industries of Alabama claims authority under the state statute to condemn packing stock butter held for renovation.[20] Does the state's claim interfere or conflict with the federal power?

On the face of the statutes a solution of the conflict might be reached on the ground that the state statute authorizes condemnation only when the packing stock butter is held for sale "within the state" in its then condition. Such a suggestion does not meet the issue, however. The bill alleges, and the motion to dismiss and stipulation admit, the seizure of a kind of raw material none of which, either that seized or used, had ever been so held or offered for sale in packing stock condition.

We lay aside also, as inapplicable, the suggestion that the highest court of Alabama, in *State* v. *Cecil,* 216 Ala. 391, 113 So. 254, held that the Agricultural Code of that state was not intended to cover goods in interstate commerce, and that, therefore, since these materials are in interstate commerce, they are beyond the scope of the Alabama Code. The opinion in the *Cecil* case dealt with a different section, one relating to licensing farm product commission merchants. The defendant was engaged in interstate business only. For that section the decision of the Alabama court is final. It did not consider the section here under examination, and in our view, which, of course, is not controlling on Alabama courts, § 495 in the absence of conflict or interference with a specific federal act would be effective to condemn goods held in Alabama under the terms of the section, even though the goods were commingled with a mass, some of which would be ultimately

---

[20] ". . . which is manufactured for sale, held in possession with intent to sell, offered or exposed for sale, or sold or delivered within this State . . ."

exported from the state. State power over food supplies held within its borders would extend at least so far. *Sligh* v. *Kirkwood*, 237 U. S. 52. On the other hand, federal control over interstate commerce would, if it is exercised, extend over that portion of the material which would ultimately be sold in Alabama as renovated butter. *Minnesota Rate Cases*, 230 U. S. 352, 399; *Currin* v. *Wallace*, 306 U. S. 1, 11; *United States* v. *Rock Royal Co-op.*, 307 U. S. 533, 568; *United States* v. *Darby*, 312 U. S. 100, 122. But, of course, if any of the finished product is offered for sale in Alabama, such product becomes immediately subject to the requirements of the pure food laws of that state.

Coming finally to the query whether the state's claim interferes or conflicts with the purpose or provisions of the federal legislation, we determine that it does. The manufacture and distribution in interstate and foreign commerce of process and renovated butter is a substantial industry which, because of its multi-state activity, cannot be effectively regulated by isolated competing states. Cf. *Steward Machine Co.* v. *Davis*, 301 U. S. 548, 588; *United States* v. *Darby*, 312 U. S. 100, 122. Its wholesome and successful functioning touches farm producers and city consumers. Science made possible the utilization of large quantities of packing stock butter which fell below the standards of public demand [21] and Congress under-

---

[21] The annual report of the Commissioner of Internal Revenue for the year ending June 30, 1903, shows that, during the first fiscal year after the adoption of the renovated butter act, the production was 54,658,790 pounds. House Doc. No. 11, 58th Cong., 2d Sess., p. 161. In more recent years, according to the report for the year ending June 30, 1940, p. 144, table 39, the production was:

| | | |
|---|---|---|
| 1931...... | 1,499,041 lbs. | 1936...... 2,252,920 lbs. |
| 1932...... | 1,124,299 " | 1937...... 2,737,181 " |
| 1933...... | 1,002,131 " | 1938...... 2,435,499 " |
| 1934...... | 1,219,166 " | 1939...... 2,906,117 " |
| 1935...... | 1,844,561 " | 1940...... 2,706,852 " |

took to regulate the production in order that the resulting commodity might be free of ingredients deleterious to health. It left the states free to act on the packing stock supplies prior to the time of their delivery into the hands of the manufacturer and to regulate sales of the finished product within their borders. But, once the material was definitely marked for commerce by acquisition of the manufacturer, it passed into the domain of federal control.

Inspection of the factory and of the material was provided for explicitly. Confiscation of the finished product was authorized upon a finding of its unsuitability for food through the use of unhealthful or unwholesome materials, a finding that might be based upon visual or delicate laboratory tests, or upon observation of the use of such materials in the process of manufacture. I. R. C. § 2325; 9 C. F. R. §§ 301.41–43. By the statutes and regulations,[22] the Department of Agriculture has authority to watch the consumer's interest throughout the process of manufacture and distribution. It sees to the sanitation of the factories in such minutiae as the clean hands of the employees and the elimination of objectionable odors, inspects the materials used, including air for aerating the oils, and confiscates the finished product when materials which would be unwholesome if utilized are present after manufacture.[23] Confiscation by the state of material in production nullifies federal discretion over ingredients.

---

[22] 9 C. F. R. §§ 301.3–21, 301.32–33.

[23] Id., "301.33 Deleterious products seizable. The Secretary of Agriculture will determine whether or not materials being used in the manufacture of process or renovated butter will be deleterious to health or unwholesome in the finished product. If any materials which have been so determined to be deleterious to health or unwholesome in the finished product are found to be present in any process or renovated butter, intended for, or in course of, exportation or shipment in interstate commerce, such process or renovated butter will be confiscated, as provided for in § 301.44."

It is said that the state and the United States have worked coöperatively in protecting consumers from vicious practices in the handling of processed butter; that any action by the state aids the policy of both in disposing of unfit food; and that therefore a harmonious federal-state relationship should not be hampered. Our duty to deal with contradictory functions of state and nation, on any occasion, and particularly when one or the other is challenged by private interests, calls for the utmost effort to avoid conclusions which interfere with the governmental operations of either. Nothing could be more fertile for discord, however, than a failure to define the boundaries of authority. Clashes may and should be minimized by mutual tolerance; but they are much less likely to happen when each knows the limits of its responsibility. And, it is only reasonable to assume that the theory of denying inconsistent powers to a state is based largely upon the benefits to the regulated industry of freedom from inconsistencies.

Congress hardly intended the intrusion of another authority during the very preparation of a commodity subject to the surveillance and comprehensive specifications of the Department of Agriculture. To uphold the power of the State of Alabama to condemn the material in the factory, while it was under federal observation and while federal enforcement deemed it wholesome, would not only hamper the administration of the federal act but would be inconsistent with its requirements. Whether the sanction used to enforce the regulation is condemnation of the material or the product is not significant. Since there was federal regulation of the materials and composition of the manufactured article, there could not be similar state regulation of the same subject.[24]

*Reversed.*

---

[24] Cf. *Charleston & W. C. Ry. Co.* v. *Varnville Co.*, 237 U. S. 597, 604,—"When Congress has taken the particular subject-matter in hand

MR. CHIEF JUSTICE STONE:

I think the judgment should be affirmed.

The decision of the Court appears to me to depart radically from the salutary principle that Congress, in enacting legislation within its constitutional authority, will not be deemed to have intended to strike down a state statute designed to protect the health and safety of the public unless the state act, in terms or in its practical administration, conflicts with the act of Congress or plainly and palpably infringes its policy. *Sinnot* v. *Davenport,* 22 How. 227, 243; *Missouri, K. & T. Ry. Co.* v. *Haber,* 169 U. S. 613, 623; *Reid* v. *Colorado,* 187 U. S. 137, 148; *Savage* v. *Jones,* 225 U. S. 501, 533; *Missouri, K. & T. Ry. Co.* v. *Harris,* 234 U. S. 412, 419; *Carey* v. *South Dakota,* 250 U. S. 118, 122; *Atchison, T. & S. F. Ry. Co.* v. *Railroad Commission,* 283 U. S. 380, 391; *Townsend* v. *Yeomans,* 301 U. S. 441, 454; *Kelly* v. *Washington,* 302 U. S. 1, 10; cf. *Maurer* v. *Hamilton,* 309 U. S. 598, 614.

We have here no question of an unexercised discretionary power given by Congress to a federal official as the means of regulating interstate commerce, where the full exercise of his authority would conflict with an assertion of the state power. In such circumstances the state's authority to act turns upon the question, which this Court has often been called upon to answer, whether the failure of the federal official to exercise his full power is in effect a controlling administrative ruling that no further regulation by either federal or state government is needful. *Napier* v. *Atlantic Coast Line Ry. Co.,* 272 U. S. 605; cf. *Mintz* v. *Baldwin,* 289 U. S. 346; *Northwestern Bell Telephone Co.* v. *Railway Commission,* 297 U. S. 471; *Welch Co.* v. *New Hampshire,* 306 U. S. 79.

---

coincidence is as ineffective as opposition. . . ." *Erie R. Co.* v. *New York,* 233 U. S. 671, 683,—"It is not that there may be division of the field of regulation, but an exclusive occupation of it when Congress manifests a purpose to enter it."

Here, concededly, the Secretary is exercising all the authority he has. His authority under 32 Stat. 196, 26 U. S. C. § 2325, to seize and condemn is restricted to the manufactured product, "renovated butter." It does not extend to "packing stock butter" intended to be used in making the product. But as construed by the Court the act has deprived Alabama of the power which it would otherwise possess to seize spoiled packing stock butter, without conferring that authority on any federal officer. Thus both the federal and the state governments are left powerless to condemn an article which is a notorious menace to health,[1] a substantial part of which is never shipped out of the state. A congressional purpose to immunize from regulation, state and national, a substance so obviously requiring control is not lightly to be inferred, especially where public health or safety is concerned. *Mintz* v. *Baldwin, supra,* 350; *Kelly* v. *Washington, supra,* 14; *Welch Co.* v. *New Hampshire, supra,* 85.

The Secretary is also given authority by the federal act to inspect the place and process of manufacturing renovated butter, the ingredients going into it, and the renovated product itself, which he may confiscate if he finds it to be deleterious to health. But his authority over packing stock butter before it is used for manufacture is restricted to its inspection. The inspection thus affords a means of determining whether the manufactured product in which packing stock is used, and which the Secretary may seize, contains a deleterious ingredient, the presence

---

[1] A report of August 25, 1933, p. 3, by a member of the staff of the microanalytical laboratory of the Food and Drug Administration indicated the following contents in three samples of 100 grams each from certain lots of packing stock seized from companies which manufacture renovated butter: (A) 37 fly maggots, 7 rodent hairs, 1 feather, cinders and sand; (B) 4 fly maggots, 1 fly, 2 ants, 1 cow hair, 1 human hair, grass and sawdust; (C) 1 fly maggot, 11 brown ants, 1 human hair, 1 beetle larva, 1 beetle head.

of which in the product can often be ascertained, if at all, only by delicate chemical tests.[2]

The legislative history of the federal act shows, what is evident from its words, that its aim is to use the federal power to prevent, by seizure and condemnation, the interstate distribution of renovated butter when found unfit for food. 35 Cong. Rec. 3316, 4586. The grant of authority to the Secretary to inspect the ingredients and seize the product gives no indication of a congressional purpose to hamper state control over the contaminated materials before their manufacture into the finished product. Indeed, Congress not only confined the Secretary's authority to make seizures to the renovated product, but in assuming this control it was at pains to provide by 32 Stat. 193, 21 U. S. C. § 25, that the states should be free to exert their police power over the renovated material "in the same manner as though" it "had been produced in such State or Territory." The sponsor in the Senate of the bill containing this provision emphasized that it was not intended to restrict the power of the states, but rather to expand their authority to include original packages in interstate commerce. 35 Cong. Rec. 3605. In the face of these disavowals with respect to the finished product which Congress brought under federal authority, one can hardly infer a congressional purpose to restrict the states' power over the ingredient which Congress did not seek to control; or that Congress could have had any object in denying the states power to seize the offensive ingredient when it left them free to seize the product because it contained the ingredient.

Moreover, not only is there a complete want of conflict between the two statutes and their administration, but it seems plain that the Alabama statute, both by its terms and in its practical administration, aids and supplements

---

[2] See Note 3, *infra*.

the federal regulation and policy. Consequently there is no room for any inference that Congress, by its enactment, sought to stay the hands of the state in the exercise of a power with which the federal act does not conflict. The basic and identical concern of both governments is to protect the consuming public from contaminated butter. If the state seizes unfit packing stock, the federal authorities are relieved of the necessity of detecting it and of seizing the renovated product which it contaminates.[3] In exercising the powers conferred on him by the Act, the Secretary is not concerned with the quality of packing stock save as it is used in making renovated butter. Seizure of it by the state at the same time removes all necessity and duty of federal inspection, since, in any

---

[3] The Assistant Chief of the Bureau of Dairy Industry, in a letter to the Solicitor for the Department, July 22, 1941, which accompanied a proposed bill to give the department authority to condemn filthy ingredients going into renovated butter, said:

"It is axiomatic that despite the processes through which butter or butter oil pass during the course of manufacturing renovated butter, certain soluble materials unfit for human consumption cannot be removed and it is difficult if not impossible to detect them in the finished product. For example, a lot of butter may be infested with maggots and should be condemned for use in the manufacture of renovated butter. If not, in the melting process fat from these maggots will be mixed with the butter fat and the animal fat may be detected in the finished product only by chemical laboratory tests, if at all."

A representative of the Department, appearing at the House Committee Hearings on the Agricultural Appropriation Bill for the fiscal year ending June 30, 1913, noted another difficulty in locating contaminated renovated butter:

"But if 500 pounds of rotten packing stock is in a factory, maybe there is 10,000 pounds of other packing stock there; and you can understand how impossible it is for us to follow through that packing stock so as to be able to identify it when it comes out of the factory and is offered for sale."

Hearings of the House Committee on Agriculture on the Agricultural Appropriation Bill, 62d Cong., 2d Sess., p. 328.

174

event, it will never become an ingredient of renovated butter.

The opinion, while recognizing that the Department has long taken the view that it has no power to seize packing stock butter, disregards administrative actualities in assuming that state seizure of it would involve an "intrusion" into the federal domain, which would "hamper the administration of the federal act." The record of administration is not one of belligerency and jurisdictional jealousy, but of active and sympathetic coöperation between state and federal agencies in effecting a common purpose, prevention of the consumption of unfit butter, whether that objective is accomplished by state seizure of the packing stock or federal condemnation of the renovated product.[4] To find in such circumstances an intent to restrict

[4] The Memorandum of the Chief of The Bureau of Dairy Industry to the Solicitor of The Department of Agriculture, October 4, 1940, states in part: "The development and perfection during the past few years of new methods for analyzing and examining butter has resulted in increased regulatory activity and action against farm-made or 'packing stock' butter intended for use in the manufacture of process or renovated butter. Certain State regulatory agencies and the Federal Food and Drug Administration have been particularly active.

"The Bureau of Dairy Industry, which is the administrative agency designated by the Secretary of Agriculture to enforce the process or renovated butter act, is entirely sympathetic with the activities of these agencies, although the apparently limiting provisions of Section 5 of the Act of May 9, 1902 (32 Stat. 196), with which this Bureau is primarily concerned, as construed in opinions of your office, have necessarily governed and guided this Bureau in its administrative policy in carrying out the provisions of the Act."

In his Annual Report on Regulatory Work of the Bureau of Dairy Industry, 1940, the Officer in Charge of Dairy Products Inspection reported, p. 4: "In conducting the inspection of all process or renovated butter factories, this office has maintained close contact with . . . local state and city regulatory agencies and officials and whenever possible cooperative action for improvement of conditions have been taken." Id., 1939, p. 4: "The result of State regulatory activity in the

state power, not required by the words of the statute, is to condemn a working, harmonious federal-state relationship for the sake of a sterile and harmful insistence on exclusive federal power.

The controlling elements in this case seem identical with those in the application of the Pure Food and Drugs Act of 1906, 34 Stat. 768, which this Court has held imposes no restriction on state action which supplements the federal act and does not conflict with its terms or practical administration. In sustaining local regulations requiring the labels placed on animal foodstuffs to disclose their ingredients, in addition to the truthful description of the product demanded by the federal act, this Court said: "The requirements, the enforcement of which the bill seeks to enjoin, are not in any way in conflict with the provisions of the Federal act. They may be sustained without impairing in the slightest degree its operation and effect. There is no question here of conflicting standards or of opposition of state to Federal authority." *Savage* v. *Jones, supra,* 225 U. S. at 539. State regulation yields only when it is in conflict with the administration or terms of the Pure Food and Drugs Act. Cf. *McDermott* v. *Wisconsin,* 228 U. S. 115. The same view has been taken in other cases where state and federal governments

South has been beneficial in improving the procurement methods used in getting packing stock butter to the factories. More frequent pickups have been inaugurated and both Atlanta and Birmingham factories have expended hundreds of dollars in new specially made cans with tight fitting covers, and the packing stock received is very much cleaner." *Id.,* 1938, p. 2: "Much of the credit for improvement in quality of packing stock butter belongs to State and Federal regulatory agencies cooperating in campaigns to improve procurement practices." *Id.,* p. 3: "In conducting the inspection of process or renovated butter factories, this office has maintained close contact with State and city regulatory officials and when deemed advisable cooperative action for improvement of sanitary conditions has been taken."

by concurrent and nonconflicting control over subjects of commerce were seeking to protect the health or safety of the public. *Corn Products Refining Co.* v. *Eddy,* 249 U. S. 427; *Reid* v. *Colorado,* 187 U. S. 137; *Missouri, K. & T. Ry. Co.* v. *Haber, supra,* 169 U. S. 613; cf. *Whipple* v. *Martinson,* 256 U. S. 41; *Hartford Accident & Ind. Co.* v. *Illinois,* 298 U. S. 155; *Kelly* v. *Washington, supra,* 302 U. S. 1. Such should be our construction of the Renovated Butter Act. It seems ironical for us to say that although state seizures of petitioner's packing stock are not precluded by the judicial and administrative [5] construction of the Pure Food and Drugs Act, which authorizes federal confiscation of the filthy ingredient, petitioner has nevertheless discovered an avenue of escape by appeal to the Renovated Butter Act which does not authorize federal seizure of the ingredient.

It is one thing for courts in interpreting an Act of Congress regulating matters beyond state control to construe its language with a view to carrying into effect a general though unexpressed congressional purpose. It is quite another to infer a purpose, which Congress has not expressed, to deprive the states of authority which otherwise constitutionally belongs to them, over a subject which Congress has not undertaken to control. Due regard

---

[5] A report by the officer in charge of the Cereal and Dairy Section, Food Division, of the Food and Drug Administration, to the Commissioner of Food and Drugs, on January 20, 1942, discloses that between July 1, 1933 and January 1, 1942, thirty-six seizures were made of lots of packing stock butter consigned to process butter plants. In commenting upon the extent of state coöperation in such seizures, it was noted that in twenty-one of such cases the packing stock was detained by the state authorities pending the filing by federal officials of a libel for condemnation proceedings under the Pure Food and Drugs Act, 21 U. S. C. § 334. These seizures included four lots of packing stock totaling over 5,000 pounds shipped to petitioner, and detained by the Alabama authorities until condemnation proceedings were begun in the federal court.

for the maintenance of our dual system of government demands that the courts do not diminish state power by extravagant inferences regarding what Congress might have intended if it had considered the matter, or by reference to their own conceptions of a policy which Congress has not expressed and is not plainly to be inferred from the legislation which it has enacted. Considerations which lead us not to favor repeal of statutes by implication, *United States* v. *Borden Co.*, 308 U. S. 188, 198–9; *United States* v. *Jackson*, 302 U. S. 628, 631; *Posados* v. *National City Bank*, 296 U. S. 497, 503, 505, should be at least as persuasive when the question is one of the nullification of state power by congressional legislation.

MR. JUSTICE FRANKFURTER, MR. JUSTICE MURPHY, and MR. JUSTICE BYRNES join in this opinion.

MR. JUSTICE FRANKFURTER:

I agree entirely with the opinion of the CHIEF JUSTICE. I shall add only a few words on the general bearing of the majority opinion upon the legislative process.

From the very beginning of our government in 1789, federal legislation like that now under review has usually not only been sponsored but actually drafted by the appropriate executive agency. This was true of the Act of August 10, 1912, 37 Stat. 273, amending the Renovated Butter Act. The Department of Agriculture not only urged the enactment of the legislation upon Congress, it drafted its provisions. If the Department wanted Congress to withdraw from the states their power to condemn unsanitary packing stock and to confide such power in the federal government, it could easily have made appropriate provision in the draft submitted by it to Congress. However, the Department did not do so. It did ask Congress to make some restrictions upon the authority which had been exercised by the states in regulating the manufac-

ture and sale of butter for the protection of their citizens. But the restrictions did not include withdrawal from the states of the power to condemn unhealthful packing stock butter. The sponsors of this legislation, the experts of the Department of Agriculture, could have submitted to Congress appropriate language for the accomplishment of that result. They did not do so. The Court now does it for them even though the Department has no such desire.

To require the various agencies of the government who are the effective authors of legislation like that now before us to express clearly and explicitly their purpose in dislodging constitutional powers of states—if such is their purpose—makes for care in draftsmanship and for responsibility in legislation. To hold, as do the majority, that paralysis of state power is somehow to be found in the vague implications of the federal renovated butter enactments, is to encourage slipshodness in draftsmanship and irresponsibility in legislation.

The majority opinion points out that the successive Solicitors of the Department of Agriculture have uniformly been of the opinion that the Department lacks the power to condemn or destroy unwholesome packing stock butter. If the Department were not content to have the states continue to exercise that power, it would have gone to Congress. In these circumstances it is strange to find in this legislation a denial to the states of powers which the Department has disclaimed and to the exercise of which by the states it has never objected.

The result of this decision is to deny Alabama the power to protect the health of its citizens without replacing such protection by that of the federal government. The CHIEF JUSTICE does well to call attention to the fact that such a construction of the Renovated Butter Act gratuitously destroys the harmonious coöperation between the nation and the states in safeguarding the health of our people. If

ever there was an intrusion by this Court into a field that belongs to Congress, and which it has seen fit not to enter, this is it. And what is worse, the decision is purely destructive legislation—the Court takes power away from the states but is, of course, unable to transfer it to the federal government.