Henry Clay Greenberg, J.
This is a certiorari proceeding to review a decision madé by the Board of Standards and Appeals of the City of New York, which affirmed a determination of the fire commissioner that ‘ ‘ Nitramon, ’ ’ a product manufactured and shipped by du Pont, petitioner herein, was an explosive within the purview of the applicable provisions of the Administrative Code of the City of New York and subject to the restrictions there set forth.
It has been stipulated that all of the proposed shipments of “Nitramon” to which the commissioner’s ruling has been applied were shipments in interstate or foreign commerce. (The effect of the entire stipulation between the parties is to reduce the dispute to a question of law.) The controversy has arisen because du Pont, which manufactures “Nitramon” in New Jersey, ships it to New York for loading onto vessels bound for foreign ports. The commissioner’s interpretation now under attack that “ Nitramon ” is an explosive within the meaning of the Administrative Code provision brings into play the landing restrictions of subdivision d of section C19-32.0, that: “ It shall be unlawful to land or place explosives upon a dock, pier, bulkhead or other landing place. * * _ * Explosives intended for shipment to points outside the city may be transferred from a vessel directly to another vessel lying at a city dock or pier designated by the commissioner, provided *102 the amount so transferred does not exceed twenty-five hundred pounds. All such shipments, in excess of twenty-five hundred pounds and not exceeding five thousand pounds, must he transferred from vessel to vessel at a distance of not less than one thousand feet from any pier line.” Thus, du Pont under this ruling would be entirely prohibited from loading ‘ ‘ Nitramon ’ ’ from city piers onto vessels though intended for foreign shipment. In addition, the limited provision allowed for transshipment from one vessel to another is obviously of no practical value with regard to a product normally shipped in fairly large quantities.
The question here presented involves a consideration of the statutes and regulations of the Federal Government governing-such shipment in interstate and foreign commerce as well as the provisions of the local law, keeping in mind the basic principle that in this field, if Federal action has been taken, local law must be deemed inoperative if inconsistent or conflicting in any respect therewith. Federal regulation supersedes a local law on the same subject, even though it involves a matter of the police power of government, if the field of operation is under our Constitution in the Federal domain (Quaker Oats Co. v. City of New York, 295 N. Y. 527). The Federal Government, it should be observed, is no less zealous of the public interest than the local authorities.
Respondents concede all this, but urge that this local law occupies a field not covered or pre-empted by Federal law, is not inconsistent with it, and does not violate the Commerce Clause of the Constitution although it may incidentally affect a matter of interstate and foreign trade. They contend that the rule to be here applied is that when Congress occupies only a limited field, local law in the proper exercise of the police power outside that limited field is not forbidden. (Savage v. Jones, 225 U. S. 501; Kelly v. Washington, 302 U. S. 1; Cloverleaf Co. v. Patterson, 315 U. S. 148.) Respondents’ specific argument is that as to this matter ‘£ federal law consists of a limited number of regulations regarding- the packaging of nitro-carbonitrate [the product which Du Pont has trade-named £ Nitramon ’] for transportation in interstate and foreign trade, while the local law merely incidentally regulates its handling as an explosive in the territorial limits of the City of New York.” We must therefore determine whether the Federal regulations are so limited or whether, as claimed by petitioner, they cover the matter of loading as well as packaging and transportation of this article and must therefore be deemed to control that activity as well.
*103 This principle of the separation of areas of control as between the Federal and local authorities has actually been set forth in their respective laws on this subject of explosives when shipped in the course of interstate or foreign trade. The Administrative Code section dealing with explosives expressly disclaims any intention to infringe upon Federal action by stating (§ C19-4.0): “ Nothing contained herein shall be construed as applying to the transportation of any article or thing shipped in conformity with the regulations prescribed by the Interstate Commerce Commission ”. And in chapter 7 of title 46 of the United States Code, entitled “ Carriage Of Explosives Or Dangerous Substances,” it is provided in section 170 (subd. [7], par. [d]): “ Nothing contained in this section shall be construed as preventing the enforcement of reasonable local regulations now in effect or hereafter adopted, which are not inconsistent or in conflict with this section or the regulations of the Commandant of the Coast Guard established hereunder.” (The authorization to regulate with regard to explosives and other dangerous articles transported on the navigable waters of the United States had in 1941 been transferred to the Commandant of the Coast Guard.)
Section 170 of title 46 of the United States Code (subd. [7], par. [a]) provides that “ In order to secure effective provisions against the hazards of health, life, limb, or property created by explosives or other dangerous articles or substances ” the Commandant of the Coast Guard shall by regulations define, describe, name and classify all explosives and other dangerous articles; also with respect to their marking, handling storage, stowage and use on board vessels; also any other regulations for their “ safe transportation, carriage, conveyance, storage, stowage, or use * * * on board such vessels as the Commandant of the Coast Guard shall deem necessary ”. Paragraph (b) provides that “ The transportation, carriage, conveyance, storage, stowage, or use of such explosives or other dangerous articles or substances shall be in accordance with the regulations so established, which shall * * * be binding upon shippers and the owners * * * of such vessels, and upon all other persons transporting, carrying, conveying ” such articles on board any vessels. Paragraph (e) provides that the Coast Guard shall issue no permit “ for the loading or discharging- to or from any vessel * * * of any explosives unless such explosives, for which a permit is required by the regulations promulgated pursuant to this section, are packaged, marked, and labeled in conformity with regulations prescribed by the Interstate Commerce Commission * * * and unless *104 such permit or authorization specifies that the limits as to maximum quantity, isolation and remoteness established by local, municipal, territorial, or State authorities for each port shall not be exceeded.”
Paragraph (e), it will be noted, refers only to “ explosives ” and not “ other dangerous articles,” and only to such explosives for which a permit is to be required by the regulations of the Commandant. Those regulations (Code of Fed. Beg., tit. 33, §§ 126.09, 126.17) require a permit only for the most dangerous of explosives, classified by the Federal authorities as Class A. It is only as to “ such explosives ” that the limits established by local authorities shall not be exceeded. The loading or discharging of all other explosives, Class B and Class C, and “ other dangerous articles,” which includes “ Nitramon,” is not made subject to local restrictions by the Federal statute.
11 Nitramon ’ ’ is a blasting agent developed by Du Pont in 1935 to replace commercial dynamites. It is sold for use in conjunction with a primer which, when it is caused to explode while in immediate juxtaposition with “ Nitramon,” will detonate the latter and produce an explosion equivalent to that produced by large diameter dynamite. In other words, “ Nitramon ” by itself is not truly an explosive, but may be detonated by any explosion in its immediate area. Du Pont claims that over 500,000,000 pounds have been shipped through normal transportation channels without a single incident of injury or damage attributable to the accidental detonation of “ Nitramon ”. Bespondents, however, point to the fact that “ Nitramon ” is composed principally of ammonium nitrate (92.42%) and thus comes clearly within the definition of an explosive in the code (§ C19-2.0, subd. 14); that a serious shock or intense fire may. cause it to explode and, when involved in a fire, it may greatly intensify the burning of all combustible materials. Bespondents concluded that it should be subjected to the restrictions applicable to all explosives set forth in the code in order to avoid even the remote possibility that it might be accidentally exploded and cause serious injury to the people and property of this congested area.
Although, under the one broad definition in the code, ‘1 Nitramon ’ ’ was determined by the fire commissioner to be an explosive, thus requiring enforcement at city piers of the code restrictions with respect to its handling and loading to the same degree as any other explosive, the Interstate Commerce Commission as well as the Commandant of the Coast Guard have classified it as an oxidizing material rather than a direct explosive. The Federal classification divides explosives into *105 three groups, A, B and C, and “ other dangerous articles ” into seven separate categories, one of which is oxidizing materials ” (Code of Fed. Reg., tit. 46, § 146.01-4). In 1954 the Coast Gfuard regulations made a further refinement in classification of ammonium nitrate, the equivalent of “ Nitramon,” depending upon the type of coating and packaging, and established specific rules for loading and discharging of each group.
The Coast Gfuard regulations reveal a comprehensive, detailed and complete system of regulation and supervision. The captain of the port ‘ ‘ may supervise and control the transportation, handling, loading, discharging, stowage or storage ” of explosives and other dangerous articles or cargo (Code of Fed. Reg., tit. 33, § 6.12-1). The Commandant “may designate waterfront facilities for the handling and storage ” of all such articles and for the “ loading and dischargeing ” thereof from vessels, and may require owners of vessels to obtain permits for loading and unloading from the captain of the port (Code of Fed. Reg., tit. 33, § 6.12-3). A “ waterfront facility ” is defined as a pier, wharf, dock or similar structure (§ 6.01-4). Only such facilities as fulfill the numerous and exacting safety requirements of section 126.15 may be so designated. There are stated máximums for each class of explosive and for each category of “ other dangerous articles ” beyond which they may not be handled, etc., at any one time without notification to the captain of the port; the permissible maximum for oxidizing materials is 100 tons (§ 126.27, subd. [b]). The captain of the port is given authority to require any transaction involving any class or category in any amount to be conducted under his supervision (§ 126.29) and to terminate or suspend the permission given by the regulations whenever he deems such action necessary for the security or safety of the port, vessels or waterfront facility (§ 126.31).
With regard to ammonium nitrate, there has been a change in the regulations. Prior to the 1954 reclassification, it was provided that shipments of this product in amounts exceeding 500 pounds could not be loaded on or discharged from any vessel until authorized by the District Commander, who was to withhold permission if this was to be done in a congested area of the port until a more remote area was available (Code of Fed. Reg., tit. 46, § 146.22-30). The 1954 amendment revised this regulation by providing different requirements for each of the types of ammonium nitrate now established; for example, when organic coated and packaged in paper bags, it could not be loaded or discharged except “ at facilities so remotely situated from populous areas and/or high value or high hazard indus *106 trial facilities ” (§ 146.22-30, subd. [b]) that loss of lives or property would be minimized in case of explosion or fire. “Nitramon” comes within the far safer classification of (§ 146.22-30, subd. [c], par. [2]), i.e., of dynamite grade, without organic coating, and packaged in sealed metal containers. It is there provided that it “ may be loaded or discharged at any waterfront facility which conforms to port security and local regulations,” and that “No permit is required for this transaction.” (It will be observed that it is only the pier where the loading is to take place, and not the loading itself, which shall conform to Coast Guard as well as local regulations. But this does point the way to a practical solution of the problem. Arrangements may be made by the city authorities with the Coast Guard to have this product loaded at selected piers.)
It is abundantly clear that the Federal Government has acted and that Federal regulations do cover the specific situation here involved — the loading and unloading of ‘ ‘ Nitramon ’ ’ on the city’s piers and docks for shipment in interstate or foreign commerce. The loading and unloading of cargo is one of the acts in the shipping process and an essential part of a transaction in trade or commerce.
The determination that “ Nitramon ” as an explosive under the Administrative Code definition is subject to the provisions of subdivision d of section C19-32.0 of the code, prohibiting entirely its being landed or placed upon any city pier or dock and restricting the quantity thereof allowed to be transferred from one vessel to another in the nearby area; is in obvious conflict with the Federal regulations directly authorizing loading and unloading of that product up to a stated maximum amount at piers and docks which conform to port security and local regulations. To the extent, then, that the shipment is intended for interstate or foreign commerce, this determination must be held to be inoperative, since the transaction is governed by the applicable Federal regulations. To the extent, however, that interstate or foreign commerce is not affected, it is doubtful that the city authorities may treat “ Nitramon ” as an explosive oven under the code definition.
The decision of the board is accordingly reversed and the determination that “ Nitramon,” when shipped in interstate or foreign commerce, may not be loaded or unloaded on docks or piers in the city of New York or transferred from vessel to vessel except in the limited quantities set forth in the code, being inconsistent with Federal regulations covering that subject, is annulled. Settle order.