In the Matter of the Tax Appeal of ALOHA AIRLINES, INC., Taxpayer

(CASE NO. 1772)

AND

In the Matter of the Tax Appeals of HAWAIIAN AIRLINES, INC., Taxpayer

(CASE NOS. 1853 AND 1868)

NOS. 7078 AND 7751

JUNE 23, 1982

RICHARDSON, C.J., LUM, NAKAMURA, JJ.,
RETIRED JUSTICE MARUMOTO IN PLACE OF
OGATA, J., DISQUALIFIED, AND RETIRED JUSTICE MENOR
ASSIGNED BY REASON OF VACANCY

2

OPINION OF THE COURT BY NAKAMURA, J.

Aloha Airlines, Inc. and Hawaiian Airlines, Inc. (hereafter Aloha and Hawaiian, respectively; the taxpayers, collectively) challenge the taxation of inter-island air carriers under the Public Service Company Tax Law, HRS Chapter 239, in these consolidated appeals from the Tax Appeal Court. They claim the assessment of a tax on the "gross income each year from the airline business" pursuant to HRS § 239-6[1] runs afoul of the federal constitution's

---

[1] HRS § 239-6 reads as follows:

*Airlines, certain carriers.* There shall be levied and assessed upon each airline a tax of four per cent of its gross income each year from the airline business; provided that if an airline adopts a rate schedule for students in grade twelve or below travelling in school groups providing such students at reasonable hours a rate less than one-half of the regular adult fare, the tax shall be three per cent of its gross income each year from the airline business. There shall be levied and assessed upon each motor carrier, each common carrier by water, and upon each contract carrier other than a motor carrier, a tax of four per cent of its gross income each year from the motor carrier or contract carrier business. The tax imposed by this section is a means of taxing the personal property of the airline or other carrier, tangible and intangible, including going concern value, and is in lieu of the tax imposed by chapter 237 but is not in lieu of any other tax.

4

Supremacy and Commerce Clauses[2] because 49 U.S.C. § 1513 pro-
scribes the levy of a tax premised on "the gross receipts derived"
from air transportation.[3] We conclude the State tax in question, as
applied to the taxpayers, has not been rendered unconstitutional by

---

[2] Article VI of the United States Constitution provides in pertinent part that
   This Constitution, and the Laws of the United States which shall be made in
Pursuance thereof; and all Treaties made, or which shall be made, under the
Authority of the United States, shall be the supreme Law of the Land; and the
Judges of every State shall be bound thereby, any Thing in the Constitution or
Laws of any State to the Contrary notwithstanding.
and Article I, § 8, cl. 3 provides that
   The Congress shall have Power . . .
   To regulate Commerce with foreign Nations, and among the several States,
and with the Indian Tribes.

[3] 49 U.S.C. § 1513, in relevant part, reads:

State Taxation of air commerce

(a) Prohibition; exemption

   No State (or political subdivision thereof, including the Commonwealth of
Puerto Rico, the Virgin Islands, Guam, the District of Columbia, the territories or
possessions of the United States or political agencies of two or more States) shall
levy or collect a tax, fee, head charge, or other charge, directly or indirectly, on
persons traveling in air commerce or on the carriage of persons traveling in air
commerce or on the sale of air transportation or on the gross receipts derived
therefrom; except that any State (or political subdivision thereof, including the
Commonwealth of Puerto Rico, the Virgin Islands, Guam, the District of Colum-
bia, the territories or possessions of the United States or political agencies of two or
more States) which levied a tax, fee, head charge, or other charge, directly or
indirectly, on persons traveling in air commerce or on the carriage of persons
traveling in air commerce or on the sale of air transportation or on the gross
receipts derived therefrom prior to May 21, 1970, shall be exempt from the
provisions of this subsection until December 31, 1973.

(b) Permissible State taxes and fees

   Nothing in this section shall prohibit a State (or political subdivision thereof,
including the Commonwealth of Puerto Rico, the Virgin Islands, Guam, the
District of Columbia, the territories or possessions of the United States or political
agencies of two or more States) from the levy or collection of taxes other than those
enumerated in subsection (a) of this section, including property taxes, net income
taxes, franchise taxes, and sales or use taxes on the sale of goods or services; and
nothing in this section shall prohibit a State (or political subdivision thereof,
including the Commonwealth of Puerto Rico, the Virgin Islands, Guam, the
District of Columbia, the territories or possessions of the United States or political
agencies of two or more States) owning or operating an airport from levying or
collecting reasonable rental charges, landing fees, and other service charges from
aircraft operators for the use of airport facilities.

the foregoing federal legislation and affirm the Tax Court's decisions.

## I.

Aloha and Hawaiian are Hawaii corporations engaged in the transportation of persons, property, and mail by air between terminal and intermediate points in Hawaii. Prior to the enactment of S.L.H. 1981, c. 167, they fell within the meaning of "Public service company" as the term was defined in HRS § 239-2 because a common carrier by air was deemed a public utility by HRS § 269-1.[4] *See In re Tax Appeal of Aloha Airlines, Inc.,* 56 Haw. 626, 627, 547 P.2d 586, 587 (1976). Although the crucial federal statute was enacted in 1973 as part of the Airport Development Acceleration Act of 1973, the taxpayers nevertheless continued to file annual returns as required by HRS § 239-4 and to pay the tax as prescribed by HRS § 239-6 without question for several years thereafter. The taxpayers' present position on the invalidity of HRS § 239-6 as it applies to airlines was initially advanced in 1977 when Aloha filed amended returns for the 1973, 1974, and 1975 calendar years. Hawaiian sought no refund of the tax payments in question until 1978 when it submitted amended returns for 1973, 1974, 1975, and 1976. All claims for refunds were summarily disallowed by the State Director of Taxation (the Director). Aloha's return for 1976 and Hawaiian's return for 1977 reflected their present views regarding the unconstitutional nature of the Public Service Company Tax. The Director, however, ruled 49 U.S.C. § 1513 was "not applicable for Hawaii tax purpose," and assessments consistent with HRS § 239-6 were made. Timely appeals to the Tax Appeal Court from the Director's determinations on the refunds and assessments followed.

---

[4] A common carrier by air is no longer considered a "public utility" within the meaning of HRS Chapter 269, which governs the activities of the Public Utilities Commission. *See* S.L.H. 1981, c. 167, § 1, Hse. Stand. Comm. Rep. No. 512, in 1981 Hse. Journal, at 1151; Sen. Stand. Comm. Rep. No. 670, in 1981 Sen. Journal, at 1201; Sen. Stand. Comm. Rep. No. 864, in 1981 Sen. Journal, at 1285. While Act 167 freed airlines of regulation by the Public Utilities Commission and the payment of certain fees and charges, HRS § 239-6 was not amended. The taxpayers ostensibly are still subject to the tax imposed by HRS § 239-6 though they may not be public utilities or public service companies as defined by HRS § 239-2.

The appeals were submitted to the Tax Appeal Court for decision on stipulated facts and briefs filed by the taxpayers and the Director. Aloha and Hawaiian conceded they were public service companies within the meaning of HRS § 239-2, but argued, as they do here, that there is an irreconcilable conflict between HRS § 239-6 and 49 U.S.C. § 1513 and the State law has been voided by the federal statute. The court rejected their arguments, ruled the Public Service Company Tax is "a property tax and a general tax," and concluded the Director properly assessed the tax against the taxpayers.

## II.

Aloha asserts the State law in question contravenes the Commerce Clause and the Supremacy Clause of the federal constitution; Hawaiian's claim of unconstitutionality is premised on the Supremacy Clause. We begin our analysis with a review of the State and federal statutory provisions involved.

## A.

Hawaii's Public Service Company Tax is a direct descendant of the Public Utility Tax which was adopted in 1932. Although airlines were not covered by the tax on public utilities when it first became effective, they became subject to the tax shortly thereafter.[5] Two decades later, air carriers were exempted from payment of the utility tax and subjected to taxation under the General Excise Tax Law.[6] The legislature reconsidered this decision in 1963 and again decided inter-island air carriers should be classified with public

---

[5] A tax designated as the Public Utility Tax was imposed on public utilities by S.L.H. 1932, c. 43, which became effective on January 1, 1933. This tax was redesignated as the Public Service Company Tax by S.L.H. 1963, c. 147, § 2(a).

Air carriers became subject to the Public Utility Tax on June 30, 1933 when a previously enacted amendment of the legal definition of "public utility" to include air carriers became effective under the terms of S.L.H. 1927, c. 100.

[6] See S.L.H. 1953, c. 279. This measure was presumably enacted so all air carriers operating in Hawaii, including inter-island carriers previously taxed under the Public Utility Tax Law, would be taxed in similar fashion under the General Excise Tax Law.

utilities for State tax purposes; it concomitantly redesignated the Public Utility Tax as the Public Service Company Tax. *See* S.L.H. 1963, c. 147, § 2(a). Airlines have since been subject to taxation pursuant to HRS § 239-6 which delineates the basis and the rates for assessing the tax against common carriers by air and water, motor carriers, and contract carriers other than motor carriers. The foregoing provisions levy a flat four or three percent tax on gross income from utility business. Others subject to the Public Service Company Tax are likewise taxed on the basis of their gross incomes, but at varying rates (beginning at 5.885%) determined in each case by the ratio between the net income and the gross income from utility business. *See* HRS § 239-5.

Our Territorial predecessors considered the nature of the levy in question early in the history of the Public Utility Tax; they concluded it "imposes a tax comparable to the *ad valorem* real and personal property taxes otherwise imposed" by the laws of the Territory of Hawaii. *Hawaii Consolidated Railway v. Borthwick,* 34 Haw. 269, 281 (1937), *aff'd,* 105 F.2d 286 (1939). And the rationale for so concluding was stated in part as follows:

Authorities on taxation have uniformly recognized with approval the efforts of some of the States to avoid the difficulties encountered in *ad valorem* assessments of the real and personal property of utilities actually employed in the utility business by substituting a tax upon gross incomes from utilities from utility business, upon net income from the same source or both. (See Lutz, Public Finance [2d ed.] p. 462, et seq.; Luce, "Assessment of Real Property for Taxation," 35 Mich. L. Rev. 1217; Ravage, "Valuation of Public Utilities for Ad Valorem Taxation," 41 Yale L. J. 487.) And this method of taxation of real and personal property of utilities within the taxing jurisdiction has the unqualified approval of the courts. It will suffice to cite the leading cases on the subject decided by the United States Supreme Court. (See *Cudahy Packing Co. v. Minnesota,* 246 U.S. 450, 453, *United States Express Co. v. Minnesota,* 223 U.S. 335, 346; *Galveston, Harrisburg, etc. Ry. Co. v. Texas,* 210 U.S. 217, 226, 227.)

*Id.* at 280. In the court's view, the "earning capacity of property devoted to the utility business . . . [was] reflected by gross income from [the] utility business." *Id.* at 281. We have not had occasion to examine the relevant taxing provisions since the specific language

covering the taxation of airlines and other carriers was adopted in 1963.

### B.

Turning to the federal statutes, we initially note the Airport and Airway Development Act of 1970, 84 Stat. 219 (the Development Act) and the Airport and Airway Revenue Act of 1970, 84 Stat. 236 (the Revenue Act) were passed in tandem "to provide for the expansion and improvement of the Nation's airport and airway system." H. R. Rep. No. 91-601, 91st Cong., 2d Sess., 1, *reprinted in* [1970] U.S. CODE CONG. & AD. NEWS 3047, 3047. In short, the Development Act declared a congressional policy to increase federal expenditures for the foregoing purpose and the Revenue Act was designed to provide the means for implementation. "In substantial part, this purpose ... [was] to be achieved through the imposition and application of airport and airway user charges." *Id.* Certain taxes already in existence were increased and other new aviation user taxes were imposed to finance the desired expansion and improvement of the system. *See* 26 U.S.C. §§ 4261 and 4271. The taxes imposed on the air transportation of persons and property were made payable in each case "by the person making the payment subject to the tax."[7] 26 U.S.C. §§ 4261(d) and 4271(b)(1). And an

---

[7] The legislative rationale for imposing the taxes on the ultimate users of air transportation was stated as follows:

The Ways and Means Committee's action, insofar as commercial carriers are concerned, obtains most of the additional tax revenue from passenger and freight ticket taxes by increasing the present 5-percent passenger ticket tax to 8 percent and by imposing a new $3 "head" tax on passenger tickets for international flights and a new 5-percent "waybill" tax on air freight.

The decision to derive the bulk of additional commercial aviation revenue from the passenger and freight ticket taxes was based upon three primary factors. First, extensive administrative experience is available from the present collection of the 5-percent passenger tax, and the collection of the additional 3 percent is merely a matter of a change in computation on the passenger's ticket from 5 percent to 8 percent (also, before 1958, a 3-percent tax was imposed on domestic freight by rail, motor vehicle, water, and air transportation). Second, a tax upon the value of a ticket or waybill will grow not only as air traffic increases in volume but also as prices rise. Third, a ticket tax is geared to charge an equitable tax related to the distance traveled and the cost per mile of air operation, since ticket prices for short flights are more per mile than long-line flights and the tax is

Airport and Airway Trust Fund was established to serve as the repository of the taxes collected and the moneys appropriated for the program.[8]

Two years later Congress' attention was redirected to the program by a perceived need for even greater federal funding of the costs of airport development. But in the meanwhile the Supreme Court's decision in *Evansville-Vanderburgh Airport Authority District v. Delta Airlines, Inc.*, 405 U.S. 707 (1972), had been issued. There, the Court held the imposition of "a charge by a State or municipality of $1 per commercial airline passenger to help defray the costs of airport construction and maintenance," *id.* at 709, did not necessarily constitute an undue burden on interstate commerce. Fearing a proliferation of similar charges at airports throughout the country, Congress included the provisions presently codified as 49 U.S.C. § 1513 in the Airport Development Acceleration Act of 1973, 87 Stat. 88-90 (1973). That the proscriptions embodied therein were in response to the judicial approval of the new head taxes adopted by state and local governments subsequent to the passage of the Airport and Airway Development and Revenue Acts of 1970 is expressly confirmed by a pertinent legislative document. *See* S. Rep. No. 93-12, 93d Cong., 1st Sess. 1, *reprinted in* [1973] U.S. CODE CONG. & AD. NEWS 1434.[9]

---

proportional to the price of the ticket. Ticket taxes on passengers and shippers are therefore an efficient and equitable user charge imposed directly on the ultimate passenger and freight users of the commercial sector of the aviation system.
H. R. Rep. No. 91-601, *supra*, at 38-39, [1970] U. S. CODE CONG. & AD. NEWS, at 3084.

[8] When the provisions of the Revenue Act that imposed the increased and new user taxes expired on October 1, 1980 as a consequence of Congress' failure to agree on the terms of an extension, the trust fund contained approximately $3,700,000,000 in unobligated funds. *Airport and Airway System Development: Hearings Before the Subcomm. on Aviation of the Sen. Comm. on Commerce, Science, and Transportation*, 97th Cong., 1st Sess. 87 (1981) (Statement of Darrell Trent, Deputy Secretary, Dept. of Transportation).

[9] The report states in relevant part that:

S. 38 prohibits a new, inequitable, and potentially chaotic burden of taxation on the nearly 200 million persons who use air transportation each year. The legislation prohibits the levying of state or local head taxes, fees, or charges either on passengers or on the carriage of such passengers in interstate commerce. The provision is in response to a situation which has been brought about by an April 19, 1972 Supreme Court decision in *Evansville-Vanderburgh Airport Authority District et*

The preemptive language chosen by Congress, however, is couched in the broadest of terms in one subsection of 49 U.S.C. § 1513. Section 1513(a) forbids the levy or collection of a state or local

> tax, fee, head charge, or other charge, directly or indirectly, on persons traveling in air commerce or on the carriage of persons traveling in air commerce or on the sale of air transportation or on the gross receipts derived therefrom.

Read literally, the subsection decrees a federal preemption of the entire field of commercial aviation taxes. For every tax, fee, or charge levied on air transportation must perforce be met, directly or indirectly, from gross receipts derived from "the airline business" or by the users of air transportation. But § 1513(b) demonstrates that Congress could not have intended so broad a preemptive sweep since the subsection permits the levy and collection of state and local

> taxes other than those enumerated in subsection (a) . . . , including property taxes, net income taxes, franchise taxes, and sales or use taxes on the sale of goods or services.

Property taxes, net income taxes, and franchise taxes, of course, are ordinarily derived from the "gross receipts" of airlines, and sales taxes applicable to air transportation can only be those where the

---

al. v. Delta Airlines, Inc. et al., upholding passenger head taxes enacted by New Hampshire and by Evansville, Indiana, for "aviation-related purposes". While this decision has invited state and local governments to enact head taxes or fees on air travelers, the Court decision does not provide adequate safeguards to prevent undue or discriminatory taxation.

S. Rep. No. 93-12, supra, at 17, [1973] U.S. CODE CONG. & AD. NEWS, at 1446.

This intent to preempt the levy of head or other user taxes is also stated in several other places in the report, to wit:

> The bill prohibits any government agency other than the United States from establishing or levying a passenger head tax or use tax on the carriage of persons in air transportation. This prohibition will ensure that passengers and air carriers will be taxed at a uniform rate — by the United States — and that local "head" taxes will not be permitted to inhibit the flow of interstate commerce and the growth and development of air transportation.

S. Rep. No. 93-12, supra, at 4, [1973] U.S. CODE CONG. & AD. NEWS, at 1435.

and

> S. 38 contains a prohibition on State taxation of passengers or on the carriage of passengers in air transportation. This prohibition will potentially deprive airport operators from a new and attractive source of revenue with which to support their airports — namely the passenger head tax.

S. Rep. No. 93-12, supra, at 11-12, [1973] U.S. CODE CONG. & AD. NEWS, at 1441.

incidence would normally be expected to fall on the ultimate users of airline services. Our task then is to harmonize the seeming contradictions consistently with the purpose of the relevant federal legislation and ascertain whether the tax imposed by HRS § 239-6 is a forbidden charge enumerated in § 1513(a) or a permitted tax described by § 1513(b).

### III.

Focusing on the allegations of unconstitutionality advanced by the taxpayers, we first address Aloha's assertion that HRS § 239-6, as it has been applied to inter-island air carriers, constitutes an undue burden on commerce.

Aloha claims the exaction of the tax in question is inconsistent with the Commerce Clause under principles enunciated in *Crandall v. Nevada*, 73 U.S. 35 (1867), *Capitol Greyhound Lines v. Brice*, 339 U.S. 542 (1950), and *Evansville-Vanderburgh Airport Authority District v. Delta Airlines, Inc., supra*. The cases in Aloha's estimation proclaim a "rule" that "a tax upon interstate commerce will only be constitutional if it is not excessive in comparison with the state or local governmental benefit conferred." Since the tax at issue generates revenues for the State's General Fund and not for purposes related to airport development and maintenance, Aloha argues the State confers no benefit in exchange for the levy and the tax therefore fails to pass constitutional muster.

But in *Crandall* and *Evansville-Vanderburgh*, the questioned charges were passenger head taxes imposed on persons traveling in interstate commerce, and in *Capitol Greyhound Lines*, the tax in question was specifically levied on interstate and intrastate carriers for the privilege of using the roads of Maryland. Consequently, we find the foregoing citations of authority inapposite, and seek guidance instead from more recent Supreme Court decisions delineating definitive standards for determining whether a state tax infringes the Commerce Clause.

"In reviewing Commerce Clause challenges to state taxes, . . . [the] goal [of the Supreme Court] has . . . been to 'establish a consistent and rational method of inquiry' focusing on 'the practical effect of a challenged tax.' *Mobil Oil Corp. v. Commissioner of Taxes*, 445 U.S.

425, 443 (1980)." *Commonwealth Edison Co. v. Montana,* 453 U.S. 609, 615 (1981). The analysis now favored by the Court is the four-part test described in *Complete Auto Transit, Inc. v. Brady,* 430 U.S. 274 (1977). "Under that test, a state tax does not offend the Commerce Clause if it 'is applied to an activity with a substantial nexus with the taxing State, is fairly apportioned, does not discriminate against interstate commerce, and is fairly related to services provided by the State.' 430 U.S., at 279." *Commonwealth Edison Co. v. Montana, supra,* 453 U.S. at 617. Aloha does not dispute that the Public Service Company Tax satisfies the first three prongs of the four-part test; it argues, as we have noted, that the tax falters on the final leg because the moneys exacted by the State are not expended for airport purposes. But Aloha's belief in this regard does not reflect the Court's views.

The Court customarily affords states wide latitude in imposing general revenue taxes, and "there is no requirement under the Due Process Clause that the amount of general revenue taxes collected from a particular activity must be reasonably related to the value of the services provided to the activity." *Id.* at 622.[10] Moreover, this latitude is not "divested by the Commerce Clause merely because the taxed activity has some connection to interstate commerce; particularly when the tax is levied on an activity conducted within the

---

[10] The Court went on to say:

Instead, our consistent rule has been:

"Nothing is more familiar in taxation than the imposition of a tax upon a class or upon individuals who enjoy no direct benefit from its expenditure, and who are not responsible for the condition to be remedied.

"A tax is not an assessment of benefits. It is, as we have said, a means of distributing the burden of the cost of government. The only benefit to which the taxpayer is constitutionally entitled is that derived from his enjoyment of the privileges of living in an organized society, established and safeguarded by the devotion of taxes to public purposes. Any other view would preclude the levying of taxes except as they are used to compensate for the burden on those who pay them, and would involve abandonment of the most fundamental principle of government — that it exists primarily to provide for the common good." *Carmichael v. Southern Coal & Coke Co.,* 301 U.S. 495, 521-522 (1937) (citations and footnote omitted).

*See St. Louis & S. W. R. Co. v. Nattin,* 277 U.S. 157, 159 (1928); *Thomas v. Gay,* 169 U.S. 264, 280 (1898).

Commonwealth Edison Co. v. Montana, *supra,* 453 U.S. at 622-23.

State." *Id.* at 623. For it was never "the purpose of the commerce clause to relieve those engaged in interstate commerce from their just share of state tax burden even though it increases the cost of doing the business." *Western Live Stock v. Bureau of Revenue,* 303 U.S. 250, 254 (1938). And this share of the burden includes sharing in the cost of benefits such as "a trained work force and the advantages of a civilized society." *Japan Line, Ltd. v. County of Los Angeles,* 441 U.S. 434, 445 (1979). We experience no difficulty in concluding that the imposition of Hawaii's Public Service Company Tax on a Hawaii corporation engaged in business as an inter-island air carrier does not constitute an undue burden on commerce, and move on to the problems engendered by the Supremacy Clause.

## IV.

### A.

The Supremacy Clause provides that the " 'Constitution, and the Laws of the United States which shall be made in Pursuance thereof . . . shall be the supreme Law of the Land . . . any Thing in the Constitution or Laws of any State to the Contrary notwithstanding.' [U.S. Const.] Art. VI, cl. 2. It is basic to this constitutional command that all conflicting state provisions be without effect. See *McCulloch v. Maryland,* 4 Wheat. 316, 427 (1819). See *Hines v. Davidowitz,* 312 U.S. 52(1941)." *Maryland v. Louisiana,* 451 U.S. 725, 746 (1981). Yet there is no unerring test to determine just when a state provision is without effect by reason of preemption. As the Court teaches us,

> [t]here is not — and from the very nature of the problem there cannot be — any rigid formula or rule which can be used as a universal pattern to determine the meaning and purpose of every act of Congress. . . . [The] Court, in considering the validity of state laws in the light of treaties or federal laws touching the same subject, has made use of the following expressions: conflicting; contrary to; occupying the field; repugnance; difference; irreconcilability; inconsistency; violation; curtailment; and interference. But none of these expressions provides an infallible constitutional test or an exclusive constitutional yardstick. In the final analysis, there can be no one crystal clear distinctly marked formula.

*Hines v. Davidowitz, supra,* 312 U.S. at 67 (footnote omitted).

14

The preemption dispute of present concern implicates the State of Hawaii's taxing power. It is fundamental that "[t]he power of taxation is indispensable to . . . [the] existence [of state governments], and is a power which, in its own nature, is capable of residing in, and being exercised by, different authorities, at the same time." *Gibbons v. Ogden*, 22 U.S. (9 Wheat.) 1, 199 (1824).[11] In this sense, it is like the police power. Hence, the "[c]onsideration [of a state tax] under the Supremacy Clause starts with the basic assumption that Congress did not intend to displace state law. See *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947)." *Maryland v. Louisiana, supra,* 451 U.S. at 746. For the historic powers of the states are "not to be superseded . . . unless that . . . [is] the clear and manifest purpose of Congress." *Rice v. Santa Fe Elevator Corp., supra,* 331 U.S. at 230. Or as the Court has otherwise stated,

[i]t will not be presumed that a federal statute was intended to

___

[11] The statement of Chief Justice John Marshall in this regard was:

The grant of the power to lay and collect taxes is, like the power to regulate commerce, made in general terms, and has never been understood to interfere with the exercise of the same power by the States; and hence has been drawn an argument which has been applied to the question under consideration. But the two grants are not, it is conceived, similar in their terms or their nature. Although many of the powers formerly exercised by the States, are transferred to the government of the Union, yet the State governments remain, and constitute a most important part of our system. The power of taxation is indispensable to their existence, and is a power which, in its own nature, is capable of residing in, and being exercised by, different authorities, at the same time. We are accustomed to see it placed, for different purposes, in different hands. Taxation is the simple operation of taking small portions from a perpetually accumulating mass, susceptible of almost infinite division; and a power in one to take what is necessary for certain purposes, is not, in its nature, incompatible with a power in another to take what is necessary for other purposes. Congress is authorized to lay and collect taxes, & c., to pay the debts, and provide for the common defence [sic] and general welfare of the United States. This does not interfere with the power of the States to tax for the support of their own governments; nor is the exercise of that power by the States, an exercise of any portion of the power that is granted to the United States. In imposing taxes for State purposes, they are not doing what Congress is empowered to do. Congress is not empowered to tax for those purposes which are within the exclusive province of the States. When, then, each government exercises the power of taxation, neither is exercising the power of the other. But, when a State proceeds to regulate commerce with foreign nations, or among the several States, it is exercising the very power that is granted to Congress, and is doing the very thing which Congress is authorized to do. There is no analogy, then, between the power of taxation and the power of regulating commerce.

Gibbons v. Ogden, *supra,* at 198-200.

supersede the exercise of the power of the state unless there is a clear manifestation of intention to do so. The exercise of federal supremacy is not lightly to be presumed.

*Schwartz v. Texas,* 344 U.S. 199, 202-03 (1952).

*Rice* also recounts the several ways in which congressional design to supplant state provisions "may be evidenced," namely:

The scheme of federal regulation may be so pervasive as to make reasonable the inference that Congress left no room for States to supplement it. *Pennsylvania R. Co. v. Public Service Comm'n,* 250 U.S. 566, 569; *Cloverleaf Butter Co. v. Patterson,* 315 U.S. 148. Or the Act of Congress may touch a field in which the federal interest is so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject. *Hines v. Davidowitz,* 312 U.S. 52. Likewise, the object sought to be obtained by the federal law and the character of obligations imposed by it may reveal the same purpose. *Southern R. Co. v. Railroad Commission,* 236 U.S. 439; *Charleston & W. C. R. Co. v. Varnville Co.,* 237 U.S. 597; *New York Central R. Co. v. Winfield,* 244 U.S. 147; *Napier v. Atlantic Coast Line R. Co., supra.* Or the state policy may produce a result inconsistent with the objective of the federal statute. *Hill v. Florida,* 325 U.S. 538.

*Rice v. Santa Fe Elevator Corp., supra,* 331 U.S. at 230. And as the Court reiterates in *Maryland v. Louisiana,*

[o]f course, a state statute is void to the extent it conflicts with a federal statute — if, for example, "compliance with both federal and state regulations is a physical impossibility," *Florida Lime & Avocado Growers, Inc. v. Paul,* 373 U.S. 132, 142-143 (1963), or where the law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Hines v. Davidowitz, supra,* at 67.

*Maryland v. Louisiana, supra,* 451 U.S. at 747.

### B.

Thus we carefully examine the statutes implicated in the present controversy to ascertain whether an unmistakable intent of Congress to displace the State law appears, mindful that there is no "infallible constitutional test" to determine congressional purpose, *Hines v. Davidowitz, supra,* 312 U.S. at 67, but knowing that there are,

nevertheless, several ways in which "[s]uch a purpose may be evidenced." *Rice v. Santa Fe Elevator Corp., supra,* 331 U.S. at 230.

### 1.

We earlier observed that 49 U.S.C. § 1513 broadly forbids the levy by state and local governments of taxes or other charges on air commerce, yet permits the collection of a wide range of state and local taxes. But as we have also seen, the exercise of federal tax power in a particular field is not necessarily incompatible with a similar exercise of power by the states. What initially appears paradoxical in the federal statutory provisions actually tells us that the federal taxation of air transportation was not meant to nullify all state and local taxes related thereto. And if anything more may be gleaned from the enumerated exemptions in 49 U.S.C. § 1513(b), it is that the primary revenue sources of the states have been placed beyond the preemptive reach of § 1513(a).[12]

### 2.

Since an inference of a pervasive federal scheme or a dominant federal interest barring the collection of all state taxes touching air transportation cannot be drawn from the relevant statutory language, we consider whether "the object sought to be obtained by the federal law and the character of obligations imposed by it . . . reveal

---

[12] This is the view of an informed observer who states:

The approach taken by the Airport Development Acceleration Act broadly restricts states from imposing taxes or "other charges" with respect to air commerce, but exempts from this broad restriction certain types of taxes such as property, income, franchise, and sales or use taxes. The exempted taxes are, of course, the major revenue sources for states and, accordingly, the Act effectively balances national interests and those of the states' revenue needs with respect to air commerce.

A. Parnell, *Constitutional Considerations of Federal Control Over the Sovereign Taxing Authority of the States,* 28 Cath. U. L. Rev. 227, 246 (1979) (footnote omitted).

When the law review article quoted above was written, the author was Senior Staff Counsel of the Ways and Means Oversight Subcommittee of the U.S. House of Representatives.

. . . [a] purpose" to cause state tax laws such as HRS § 239-6 to be without effect. *Rice v. Santa Fe Elevator Corp., supra,* 331 U.S. at 230.

The legislative history previously discussed confirms that the object of the pertinent provisions of the Airport Development Acceleration Act of 1973 was to protect the primary sources from which the Airport and Airway Revenue Act of 1970 sought revenue. *See* note 7 *supra.* These were, of course, the "[t]icket taxes on passengers and shippers . . . imposed directly on the . . . passenger and freight users of the commercial sector of the aviation system." *See* note 7 *supra. See also* note 9 *supra* and 26 U.S.C. §§ 4261 and 4271. The history further indicates a wellspring of annoyance contributing to the legislative action was the levy of "head" taxes on airline passengers by thirty-one state and local jurisdictions. S. Rep. 93-12, *supra,* at 21, [1973] U.S. CODE CONG. & AD. NEWS, *supra,* at 1450.[13] The wrath of Congress was undoubtedly directed at an unpopular tax which "brings on confusion, delay, anger and resentment and cuts against the grain of the traditional American right to travel among the States unburdened by travel taxes." S. Rep. 93-12, *supra,* at 17, [1973] U.S. CODE CONG. & AD. NEWS, *supra,* at 1446. But more significantly, these user charges also tapped the very sources of revenue that Congress had.

The State law, which antedates the Airport and Airway Revenue Act of 1970, imposes a tax on public service companies rather than the users of their services. The legislature has deemed the State levy "a means of taxing the personal property of the airline or other carrier, tangible and intangible, including going concern value." HRS § 239-6. We would not quarrel with this legislative characterization; the tax has some attributes of a property tax. *See* note 14 *infra.* As our Territorial predecessors concluded, there is ample legal support for avoiding "the difficulties encountered in *ad valorem* assessments of the real and personal property of utilities . . . by substituting a tax upon gross incomes from utilities from utility business, upon net income from the same source or both." *Hawaii Consolidated Railway v. Borthwick, supra,* 34 Haw. at 280. For the

---

[13] Hawaii was not listed therein as a jurisdiction charging "head" taxes. This stands to reason, for no one has ever equated the Public Service Company Tax with a "head" tax.

formula "give[s] effect to the intangible factors which influence real values." *Railway Express Agency v. Virginia,* 347 U.S. 359, 364 (1954) (quoted with approval in *Railway Express Agency v. Virginia,* 358 U.S. 434, 442 (1959)). *See also Illinois Central Railroad v. Minnesota,* 309 U.S. 157 (1940).[14]

The object sought by the federal law therefore reveals nothing that would preclude the subjection of Aloha and Hawaiian to the Public Service Company Tax. Nor does the character of the obligations imposed by the Airport and Airway Revenue Act disclose anything that could cause the tax to be ineffective where airlines are concerned.

3.

What we said about the Public Service Company Tax in the preceding section would also apply to an inquiry on whether the state policy declared by HRS § 239-6 "may produce a result inconsistent with the objective of the federal statute." *Rice v. Santa Fe Elevator Corp., supra,* 331 U.S. at 230. The State does not purport to "regulate" any aspect of air commerce pursuant to § 239-6. The levy in question is a revenue measure in all respects; it does not conflict with a federal regulatory scheme in the manner that the Louisiana First Use Tax on Natural Gas did with federal statutes regulating natural gas pricing. *See Maryland v. Louisiana, supra.* Furthermore, the state tax does not invade the particular area occupied by 26 U.S.C. §§ 4261 and 4271, *i.e.,* "[t]icket taxes on passengers and shippers . . . imposed directly on the . . . passenger and freight users of the commercial sector of the aviation system." *See* note 7 *supra.*

---

[14] Hawaiian's report to its stockholders for 1978 states a net valuation of its "Property and Equipment" in 1977 of $43,195,318. Its reported gross income for the same year amounted to $69,079,368. We also presume there are intangibles which increase Hawaiian's value as a company and render it higher than the net value of property and equipment. This higher value could conceivably approximate the company's operating revenues. *See* Hawaiian Airlines, Annual Report 1978, at 9-10, and the Public Service Company Tax Return filed by Hawaiian on April 9, 1978.

The annual report also states that $2,930,390, representing "U.S. excise tax on transportation", was collected by Hawaiian. This sum, however, was "paid directly and not reported in passenger revenue." Hawaiian Airlines, Annual Report, *supra,* at 17. This reflects the taxation of users, not the airlines, under the federal tax scheme.

4.

We perceive no irreconcilable conflict between regimes here. "[C]ompliance with both federal and state . . . [tax laws] is [definitely not] a physical impossibility." *Florida Lime & Avocado Growers, Inc. v. Paul, supra,* 373 U.S. at 142-43, and HRS § 239-6 does not stand "as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Hines v. Davidowitz, supra,* 312 U.S. at 67.[15] Our review thus uncovers no persuasive reasons supporting preemption here, and we can not say the nature of the federal and State taxes involved "permits no other conclusion, or that the Congress has unmistakably so ordained." *Florida Lime & Avocado Growers, Inc. v. Paul, supra,* at 142.[16]

The decisions of the Tax Appeal Court are affirmed.

*Hugh Shearer (H. Mitchell D'Olier* with him on the briefs; *Goodsill, Anderson & Quinn,* of counsel) for taxpayer-appellant Hawaiian Airlines.

*Richard L. Griffith* and *Michael A. Shea (Ralph B. Palmer* with them on opening brief; *Roger H. Epstein* with them on reply brief; *Cades, Schutte, Fleming & Wright,* of counsel) for taxpayer-appellant Aloha Airlines.

*Kevin T. Wakayama,* Deputy Attorney General, for Director of Taxation-appellee.

*Dirk D. Snel,* Attorney, U.S. Department of Justice. With him on the brief: *Sanford Sagalkin,* Acting Assistant Attorney General; *Peter R. Steenland,* Attorney, U.S. Department of Justice; and *Walter M. Heen,* U.S. Attorney, Honolulu, Hawaii, for U.S. Department of Justice, amicus curiae.

---

[15] We noted earlier that when pertinent provisions of the Airport and Airway Revenue Act expired on October 1, 1980, the Airport and Airway Trust Fund contained approximately $3,700,000,000 in unobligated funds. *See* note 8 *supra.* Speaking from the vantage point of hindsight, we would have to say the purpose and objective of Congress in enacting the provisions of 49 U.S.C. § 1513 were accomplished.

[16] Although the taxpayers now claim the language of 49 U.S.C. § 1513 clearly displays a preemptive design, this apparently escaped them for four years.

### DISSENTING OPINION OF MARUMOTO, J.

I respectfully dissent. My dissent is based on the supremacy clause of the United States Constitution.

In my opinion, the plain meaning of the following words in 49 U.S.C. § 1513(a):

No State . . . shall levy or collect a tax . . . on the sale of air transportation or on the gross receipts therefrom . . .

prohibits the State of Hawaii from collecting the tax levied under HRS § 239-6, which is based on the gross income of the airlines involved in the instant cases.

U.S.C. § 1513(b) provides: "Nothing in this section shall prohibit a State . . . from the levy or collection of taxes other than those enumerated in subsection (a) of this section, including property taxes, . . .", and HRS § 239-6 provides: "The tax imposed by this section is a means of taxing the personal property of the airline or other carrier, tangible and intangible, including the going concern value, and is in lieu of the tax imposed by chapter 237 [General Excise Tax Law] but not in lieu of any other tax."

I do not think that mere characterization of the tax as "a means of taxing the personal property of the airline or other carrier, tangible and intangible, including the going concern value," changes the essential nature of the tax as a tax "on the sale of air transportation or on the gross receipts therefrom."

At the present time, the State of Hawaii has no personal property tax as such, and there was none at the time HRS § 239-6 was enacted.

Under HRS § 239-6, the sole basis for determining the amount of the levy or collection is the gross income from the airline business. Such basis has no relationship to the value of the personal property used in the airline, tangible and intangible, including the going concern value.

Gross income of an airline is produced by a multitude of factors besides the personal property, tangible and intangible, used in the business.

In this connection, R.L.H. 1925 § 1320, quoted below in footnote

1, which was repealed in S.L.H. 1932 Second Special Session, Act 40, Section 72, is instructive.

---

[1] Text of R.L.H. 1925 § 1320:

*Basis of value for taxation.* All real and personal property and the interest of any person in any real or personal property shall be assessed separately as to each item thereof for its cash value.

Land shall be equally assessed, according to its value for use or occupancy; this value shall be determined in cities and towns, and wherever else practicable, by the Somer's system or other means of exact computation from central locations.

Provided, however, that in all cases where real and personal property, or several classes or kinds or parcels or real or personal property, respectively, are combined and made the basis of an enterprise for profit, the combined property forming such basis of such enterprise for profit, shall be assessed as a whole on its fair and reasonable aggregate value.

Land leased or sub-leased to others and not used by a taxpayer personally as a part of the combined property forming the basis of the enterprise for profit conducted by the taxpayer shall not be considered as a part of the combined property, nor included in the return or assessment of such property as a whole, but shall be separately returned and assessed.

In estimating the aggregate value of each such enterprise for profit, there shall be taken into consideration the net profits made by the same, also the gross receipts and actual running expenses; and where it is a company, being a corporation whose stock is quoted in the market, the market price thereof, as well as all other facts and considerations which reasonably and fairly bear upon such valuation.

In ascertaining the aggregate value of the property constituting the basis of an enterprise for profit for the purposes indicated by this section, there shall first be included all property combined and forming the basis of such enterprise, whether within the definition of real or personal property set forth in this chapter or not, and there then shall be deducted therefrom the value of shares in other Hawaiian corporations, held or owned by such enterprise, the value of all property on which specific taxes are levied and the value of all property that would not be taxable if not so combined and made the basis of an enterprise for profit.

Provided also, that the combined property of every corporation holding a public utility franchise and occupying the public streets or highways of the Territory, other than any such corporation that by the terms of its franchise is required to pay a percentage of its gross income to the Territory, or county or city and county, shall be valued and assessed at not less than the total amount of the par value of the capital stock issued by such corporation.