ROBERT P. GOUVEIA, Plaintiff-Appellee, *v.* NAPILI-KAI, LTD., a Hawaii corporation, dba NAPILI KAI BEACH CLUB, Defendant-Appellant

NO. 6963

(CIVIL NO. 3527)

AUGUST 16, 1982

RICHARDSON, C.J., LUM, NAKAMURA, JJ.,
AND RETIRED JUSTICES OGATA AND MENOR
ASSIGNED TEMPORARILY

190

OPINION OF THE COURT BY NAKAMURA, J.

The question posed by this interlocutory appeal is whether the Circuit Court of the Second Circuit can entertain a suit for damages resulting from the allegedly unlawful termination of Plaintiff-appellee Robert P. Gouveia's employment by Napili-Kai, Ltd., an employer subject to the National Labor Relations Act. Since Gouveia's complaint avers the discharge stemmed from an attempt to engage in collective bargaining with the employer and federal law and procedures govern the employer's obligations in this regard, we conclude the circuit court erred in denying Napili-Kai's motion to dismiss the action.

I.

The complaint contains the following allegations: Gouveia was hired by Napili-Kai to work in its personnel and accounting departments at a pay rate of $4.85 per hour on March 3, 1975; the employer represented at the time of hire that the foregoing wages were at the "union scale or above"; a year later when Gouveia was given a six percent wage increase, Napili-Kai again represented that the wages were at the "union scale"; when Gouveia learned in December of 1976 that he was not being so compensated, he "attempted to engage in collective bargaining with defendant;" Napili-Kai terminated his employment on December 20, 1976 "as a direct and proximate result of plaintiff attempting to negotiate an hourly wage rate consistent with union scale, together with other employee benefits."

On February 11, 1977, prior to the filing of the complaint, Gouveia brought an unfair labor practice charge against Napili-Kai before the National Labor Relations Board (the NLRB), claiming that his discharge was in violation of §§ 8(a)(1) and 8 (a)(3) of the National Labor Relations Act, 29 U.S.C. §§ 158(a)(1) and 158(a)(3).

The charge alleged that Napili-Kai "discriminated in regard to the hire and tenure of employment"[1] of Robert P. Gouveia on December 20, 1976 and thereafter "in order to discourage membership in a labor organization." On May 16, 1977, Gouveia and Napili-Kai executed a settlement agreement under the aegis of the NLRB, whereby Napili-Kai agreed to make Gouveia "whole" by the payment of $2,000 without admitting it had violated the federal law.[2] Subsequently, the NLRB informed both parties that the employer had complied with all requirements of the Board-sponsored settlement and closed the case.

Gouveia initiated his state action against Napili-Kai approximately three months after the NLRB notified the parties of the termination of the unfair labor practice proceeding. Napili-Kai responded with a motion to dismiss the suit, averring the claim was barred by res judicata and collateral estoppel and the doctrine of federal preemption. The circuit court denied the motion, but allowed the defendant to seek immediate review of the interlocutory order in this court.

## II.

### A.

We are again called upon to decide whether State law has been deprived of effect by the Supremacy Clause of the federal constitution, which provides that the "Constitution, and the Laws of the United States . . . made in Pursuance thereof . . . shall be the supreme Law of the Land . . . any Thing in the Constitution or Laws of

---

[1] "[D]iscrimination in regard to hire and tenure and to the terms and conditions of employment" is the phrasing normally employed by agents of the National Labor Relations Board in charging an unlawful termination of employment.

Section 8(a)(3) declares it is an unfair labor practice for an employer "by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization." It covers discharge from employment, as well as numerous other acts. *See* C. Morris, *The Developing Labor Law* 117 (1971).

[2] The settlement document was a form agreement supplied by the NLRB. The executed agreement was approved by the agent of the Board in Honolulu and the Regional Director of the Board.

any State to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2. But "there is no unerring test to determine just when . . . [state law] is without effect by reason of preemption." *In re Tax Appeal of Aloha Airlines, Inc.,* 65 Haw. 1, 13, 647 P.2d 263, 272 (1982). The Supreme Court teaches us the touchstone here is congressional intent and there are several ways in which this may be gathered. *Id.* at 14-15, 647 P.2d at 272-73. As it recently reiterated in *Maryland v. Louisiana,* 451 U.S. 725 (1981), a purpose to displace state law "may be evidenced in several ways":

> "The scheme of federal regulation may be so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it. *Pennsylvania R. Co. v. Public Service Comm'n,* 250 U.S. 566, 569; *Cloverleaf Butter Co. v. Patterson,* 315 U.S. 148. Or the Act of Congress may touch a field in which the federal interest is so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject. *Hines v. Davidowitz,* 312 U.S. 52. Likewise, the object sought to be obtained by the federal law and the character of obligations imposed by it may reveal the same purpose. *Southern R. Co. v. Railroad Commission,* 236 U.S. 439; *Charleston & W. C. R. Co. v. Varnville Co.,* 237 U.S. 597; *New York Central R. Co. v. Winfield,* 244 U.S. 147; *Napier v. Atlantic Coast Line R. Co.* [272 U.S. 605]. Or the state policy may produce a result inconsistent with the objective of the federal statute. *Hill v. Florida,* 325 U.S. 538."

*Id.* at 746-47, quoting *Rice v. Santa Fe Elevator Corp.,* 331 U.S. 218, 230 (1947). And,

> [o]f course, a state statute is void to the extent it conflicts with a federal statute — if, for example, "compliance with both federal and state regulations is a physical impossibility," *Florida Lime & Avocado Growers, Inc. v. Paul,* 373 U.S. 132, 142-143 (1963), or where the law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Hines v. Davidowitz, supra,* at 67.

*Maryland v. Louisiana, supra,* 451 U.S. at 747.

In the area of concern, Labor Law, the Court has augmented these general principles with decisional rules of particular application. A landmark case, *Garner v. Teamsters Union,* 346 U.S. 485 (1953), involved picketing which a state court enjoined on grounds

that it violated state statutory provisions similar to the unfair labor practice provisions of the federal labor relations statute. The issue before the Court was "whether the State, through its courts, may adjudge the same controversy and extend its own form of relief." *Id.* at 489. In denying the state tribunal's power to enjoin the conduct, the Court *inter alia* held:

> Congress did not merely lay down a substantive rule of law to be enforced by any tribunal competent to apply law generally to the parties. It went on to confide primary interpretation and application of its rules to a specific and specially constituted tribunal and prescribed a particular procedure for investigation, complaint and notice, and hearing and decision, including judicial relief pending a final administrative order. Congress evidently considered that centralized administration of specially designed procedures was necessary to obtain uniform application of its substantive rules and to avoid these diversities and conflicts likely to result from a variety of local procedures and attitudes toward labor controversies.

*Id.* at 490.

Though a number of significant labor preemption decisions followed on *Garner's* heels, the most noteworthy was *San Diego Building Trades Council v. Garmon,* 359 U.S. 236 (1959). For these oft-quoted passages therefrom express what are still acknowledged to be the controlling rules in the relevant area:

> When it is clear or may fairly be assumed that the activities which a State purports to regulate are protected by § 7 of the National Labor Relations Act, or constitute an unfair labor practice under § 8, due regard for the federal enactment requires that state jurisdiction must yield . . . . [T]o allow the States to control conduct which is the subject of national regulation would create potential frustration of national purposes.

> At times it has not been clear whether the particular activity regulated by the States was governed by § 7 or § 8 or was, perhaps, outside both these sections. But courts are not primary tribunals to adjudicate such issues. It is essential to the administration of the Act that these determinations be left in the first instance to the National Labor Relations Board.

> . . . When an activity is arguably subject to § 7 or § 8 of the Act, the States as well as the federal courts must defer to the

exclusive competence of the National Labor Relations Board if the danger of state interference with national policy is to be averted.

*Id.* at 244-45. "The governing consideration is that to allow the States to control activities that are potentially subject to federal regulation involves too great a danger of conflict with national labor policy." *Id.* at 246 (footnote omitted). Hence, federal law and federal procedures unquestionably determine the obligations of employers who are subject to the Act where the organizational activities of their employees and collective bargaining are concerned.[3]

## B.

Yet the "Act . . . leaves much to the states, though Congress has refrained from telling us how much." *Garner v. Teamsters Union, supra,* 346 U.S. at 488. This reticence has impelled the Court to "spell out from conflicting indications of congressional will the area in which state action is still permissible." *Id.* Where, for example, the challenged conduct has been "marked by violence and imminent threats to the public order," the Court has "allowed the States to grant compensation for the consequences, as defined by the traditional law of torts." *San Diego Building Trades Council v. Garmon, supra,.* 359 U.S. at 247. *See, e.g., United Automobile Workers v. Russell,* 356 U.S.

---

[3] Section 7 of the National Labor Relations Act describes the rights of employees thereunder; it reads:

> Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection, and shall also have the right to refrain from any or all of such activities except to the extent that such right may be affected by an agreement requiring membership in a labor organization as a condition of employment as authorized in section 8(a)(3).

Section 8 delineates and describes employer practices proscribed as unfair labor practices by the Act. It reads in pertinent part:

> Sec. 8. (a) It shall be an unfair labor practice for an employer —
>
> (1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 7;
>
> . . .
>
> (3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization.

634 (1958); *United Construction Workers v. Laburnum Construction Corp.*, 347 U.S. 656 (1954). "State jurisdiction . . . prevailed in these situations because the compelling state interest, in the scheme of our federalism, in the maintenance of domestic peace is not overridden in the absence of clearly expressed congressional direction." *San Diego Building Trades Council v. Garmon, supra,* 359 U.S. at 247.

"[D]ue regard for the presuppositions of our embracing federal system" has also led the Court "not to find withdrawal from the States of power to regulate where the activity regulated was a merely peripheral concern of the . . . Act." *Id.* at 243. The Court has likewise permitted state regulation "where the regulated conduct touched interests so deeply rooted in local feeling and responsibility that, in the absence of compelling congressional direction, . . . [it] could not infer that Congress had deprived the States of power to act." *Id.* at 244 (footnote omitted). Thus in *Linn v. Plant Guard Workers,* 383 U.S. 53 (1966), the redress of libelous statements was held to be a " 'merely peripheral concern of the . . . Act,' provided it . . . [was] limited to redressing libel issued with knowledge of its falsity, or with reckless disregard of whether it was true or false." *Id.* at 61. " '[A]n overriding state interest' in protecting its residents from malicious libels . . . [was] recognized in these circumstances." *Id.*

A state's interest in protecting the health and well-being of its citizens that overrode the federal interest in a national labor policy was also found in *Farmer v. United Brotherhood of Carpenters,* 430 U.S. 290 (1977). The tortious conduct of the defendants, a union and some of its officers, arose from the operation of a hiring hall and involved "outrageous conduct, threats, intimidation, and words" which caused the plaintiff to suffer "grievous mental and emotional distress as well as great physical damage." *Id.* at 301. The Court concluded Congress did not intend in this situation that exclusive jurisdiction should lie with the Board. For

> [n]o provision of the National Labor Relations Act protects the "outrageous conduct" complained of by petitioner Hill in the second count of the complaint. Regardless of whether the operation of the hiring hall was lawful or unlawful under federal statutes, there is no federal protection for conduct on the part of union officers which is so outrageous that "no reasonable man in a civilized society should be expected to endure it." See *supra,* at 294. Thus, as in *Linn v. Plant Guard Workers,* 383 U.S. 53 (1966),

and *Automobile Workers v. Russell, . . .* [356 U.S. 634 (1958)], permitting the exercise of state jurisdiction over such complaints does not result in state regulation of federally protected conduct. *Id.* at 302.

At the same time, however, the Court cautioned that concurrent state-court jurisdiction was impermissible where a realistic threat of interference with the federal regulatory scheme existed. Its further statement in this regard was:

> Union discrimination in employment opportunities cannot itself form the underlying "outrageous" conduct on which the state-court tort action is based; to hold otherwise would undermine the pre-emption principle. Nor can threats of such discrimination suffice to sustain state-court jurisdiction. It may well be that the threat, or actuality, of employment discrimination will cause a union member considerable emotional distress and anxiety. But something more is required before concurrent state-court jurisdiction can be permitted. Simply stated, it is essential that the state tort be either unrelated to employment discrimination or a function of the particularly abusive manner in which the discrimination is accomplished or threatened rather than a function of the actual or threatened discrimination itself.

*Id.* at 305 (footnote omitted). Though the plaintiff had obtained a judgment in the trial court which had been set aside by the state appellate court on grounds of preemption, the Court chose to remand the case for a new trial rather than to reinstate the judgment.[4]

---

[4] The Court's statement with respect to the judgment was:

Although the second count of petitioner's complaint alleged the intentional infliction of emotional distress, it is clear from the record that the trial of that claim was not in accord with the standards discussed above. The evidence supporting the verdict in Hill's favor focuses less on the alleged campaign of harassment, public ridicule, and verbal abuse, than on the discriminatory refusal to dispatch him to any but the briefest and least desirable jobs; and no appropriate instruction distinguishing the two categories of evidence was given to the jury. *See* n. 13, *supra.* The consequent risk that the jury verdict represented damages for employment discrimination rather than for instances of intentional infliction of emotional distress precludes reinstatement of the judgment of the Superior Court.

*Farmer v. United Brotherhood of Carpenters, supra,* 430 U.S. at 306-07 (footnote omitted). Note 13 *supra,* at 305 reads:

In view of the potential for interference with the federal scheme of regulation, the trial court should be sensitive to the need to minimize the jury's exposure to

A regard for the interests of the states in our federal system has thus induced judicially recognized exceptions to the *Garmon* doctrine. And state regulation of tortious conduct involving violence or threats thereof, malicious libel, and truly outrageous conduct is not precluded, provided of course that the outrageous conduct is unrelated to the practice prohibited by the federal law or does not form the basis of the prohibited practice.

## III.

Gouveia asserts his action for damages in the circuit court falls within the exception fashioned in *Farmer;* he contends the suit is premised on an intentional infliction of mental distress which has been deemed actionable in Hawaii. Still, we are not convinced that the claim can be prosecuted without undermining the preemption doctrine.

The gravamen of the one-count complaint is that the termination of plaintiff's employment "was willfully malicious, and intended to cause plaintiff severe and substantial mental distress."[5] "It may well be that the . . . employment discrimination . . . [caused] considerable emotional distress and anxiety. But something more is

---

evidence of employment discrimination in cases of this sort. Where evidence of discrimination is necessary to establish the context in which the state claim arose, the trial court should instruct the jury that the fact of employment discrimination (as distinguished from attendant tortious conduct under state law) should not enter into the determination of liability or damages.

[5] The heart of plaintiff's claim for relief reads as follows:

14. As a direct and proximate result of plaintiff attempting to negotiate an hourly wage rate consistent with union scale, together with other employee benefits, on or about December 20, 1976, defendant terminated plaintiff's employment with defendant.

15. Inasmuch as defendant's termination of plaintiff's employment with defendant occurred five days before Christmas, 1976, and inasmuch as there was no justifiable cause for defendant firing plaintiff, defendant's termination of plaintiff's employment with defendant was willfully malicious, and intended to cause plaintiff severe and substantial mental distress.

16. As a direct and proximate result of defendant's aforesaid conduct, plaintiff suffered economic loss in an amount as shall be proved at time of trial, together with great and severe physical injury and mental distress, medical expense necessary for the treatment thereof, and other damages as shall be proved at time of trial.

required before concurrent state-court jurisdiction . . . [is] permitted." *Farmer v. United Brotherhood of Carpenters, supra,* 430 U.S. at 305. For "discrimination in employment opportunities cannot itself form the underlying 'outrageous' conduct on which the state-court tort action is based; to hold otherwise would undermine the pre-emption principle." *Id.*

Gouveia complains here of a malicious termination of employment on December 20, 1976; the discharge was also the "discrimination in regard to hire and tenure of employment" that formed the basis of the unfair labor practice charge presented to the NLRB and settled with the Board's approval. But as we have seen, there is no room for state-court jurisdiction over what was the subject of an NLRB proceeding under the *Garmon* preemption rules or the *Farmer* exception thereto. "[S]omething more is required before concurrent state-court jurisdiction can be permitted." *Id.*

There was more in *Farmer* than the discrimination in regard to hire and tenure of employment proscribed by the federal law — there was other conduct "so outrageous that 'no reasonable man in a civilized society should be expected to endure it.' " *Id.* at 302. Here, the "willfully malicious" termination of plaintiff's employment is alleged as the direct and proximate cause of his physical injury and mental distress. The "something more" upon which state-court jurisdiction may possibly be predicated is not apparent on the face of the complaint.[6]

The circuit court's order is reversed, and the case is remanded with instructions to dismiss the complaint.

The plaintiff, however, should be granted leave to amend the pleading. For while he failed to state a claim that could be entertained by the circuit court and we have some doubts on whether he will be able to do so, we believe he should not be deprived of the opportunity.

*Robert S. Katz (Barry W. Marr* with him on opening brief; *Barry W. Marr* and *Howard A. Matsuura* with him on reply brief; *Torkildson, Katz, Jossem & Loden,* of counsel) for defendant-appellant.

---

[6] There is also no basis for concluding that the conduct in question falls within one of the other judicially recognized exceptions to the preemption doctrine.

*James Krueger (Stephen Goldsmith* with him on the brief; *James Krueger,* Attorney at Law, A Law Corporation, of counsel) for plaintiff-appellee.